**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4634-17T3

SUSANNA D. DARROW,

    Plaintiff-Respondent,

v.

ROBERT A. HOROWITZ,

    Defendant-Appellant.

_____

Submitted June 4, 2019 – Decided July 9, 2019

Before Judges Rothstadt and Natali.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FM-07-2671-03.

Nancy Murray Horta, attorney for appellant.

Susanna Darrow, respondent pro se.

PER CURIAM

    Defendant Robert A. Horowitz appeals from a May 14, 2018 Family Part order denying his motion to reduce his alimony obligation to plaintiff

Susanna D. Darrow under the parties' property settlement agreement (PSA), and requiring him to maintain a $1,000,000 life insurance policy for plaintiff's benefit "until death." We affirm in part and remand in part.

I.

The parties were married on June 5, 1988, and have two adult, emancipated children. An August 28, 2003 Final Judgment of Divorce (FJD) dissolved the marriage and incorporated their PSA. The PSA states that the parties intended to live together following the divorce because "[i]t would be difficult for [defendant] to live independently[] while providing [plaintiff] and [the] children with the standard of living to which they have become accustomed." The parties acknowledged that they were advised of the "standard of law set forth in Crews v. Crews, 164 N.J. 11 (2000)," and agreed that they each could maintain the marital lifestyle under the terms of the PSA.

The parties also agreed defendant's income varied between "$80,000.00 and $150,000.00" during the marriage, and that when the PSA was executed, he was earning "about $150,000.00 per year," while plaintiff was working "on a part-time basis for $8.00 per hour." Defendant further "acknowledge[d] his obligation" to provide child support for the parties' two children "through their

A-4634-17T3

emancipation," but the PSA did not establish a fixed amount of child support or alimony to be paid while the parties continued to reside together.

Instead, the PSA listed a litany of expenses that defendant would be responsible for, including expenses for the children (e.g., "summer camp and work-related child care," shoes, and sports) and expenses that otherwise would fall within the purview of alimony (e.g., "lawn mowing," food, rent, utilities, and insurance). Defendant agreed to "turn[] over his income" to plaintiff, who would "maintain the finances and directly pay all bills," but some of that income was specifically earmarked to pay off defendant's debt to the IRS secured by a judgment, which cost approximately $1015 per month.

The PSA provides that in the event the parties separated, they would have "joint legal custody of their children," but plaintiff would be the "primary caretaker" and the parent with whom the children would reside. The parties also agreed to "reevaluate their finances to ensure that [defendant] w[ould] have sufficient income available to him to provide a safe and secure home for [the children] when they visit[ed] with him."

With respect to defendant's support obligations upon separation, the parties agreed that they would "total up the out-of-pocket costs associated with all of the aforementioned expenses on an annual basis," and defendant would

pay plaintiff "as and for support for herself and the children the amount established . . . in consistent monthly installments." The PSA further provides, in paragraph twelve, that:

> [f]or tax purposes, in the event the parties are in separate residences, two thirds of the overall support paid shall be deemed child support and one-third shall be deemed alimony. The child support portion shall continue at the same rate, in lieu of cost of living increases until the youngest child is emancipated. Upon the emancipation of the second child, [defendant] shall continue to pay an amount equal to one half of the overall total amount he had been paying (above), as and for permanent alimony. . . . The parties intend for alimony to continue at least until [defendant] reaches the age of sixty-five (65). Until that time, alimony shall not terminate for any reason. The parties have considered increases or decreases in their incomes, their loss of or inability to secure employment, any prospective changes of employment, the subsequent acquisition or loss of assets, the dissipation of assets received in equitable distribution or other like changes in the quality of that spouse's economic life, in fixing the amount and term of alimony. However, should [defendant's] income change substantially, such that payment of alimony becomes an onerous burden, the parties agree [to] review alimony and modify same if necessary, in writing, and by mutual consent. Notwithstanding any future change in circumstances or mutual agreement, the amount of alimony paid by [defendant] shall never be less than half of the amount due upon emancipation of the last child.
>
> [(Emphasis added).]

A-4634-17T3

In addition, the PSA states that "[e]ach party has had explained to them the . . . holding in . . . Lepis v. Lepis, 83 N.J. 139 (1980)," and defendant "agree[d] that he shall seek no modification of the alimony amount or term recited here and that the terms of this agreement shall be final."

The PSA further classified defendant's alimony obligation as "permanent alimony," which "shall terminate upon the death of either party" or if plaintiff remarried. Paragraph twenty-two of the PSA states, in pertinent part:

> This agreement shall be fully enforceable notwithstanding any change of circumstances of [plaintiff] (i.e. [plaintiff] becoming employed on a full-time basis.) In the event of [defendant's] disability or loss of employment, [defendant] shall make a good faith effort to secure comparable employment with a comparable income for a period of at least one full year before he shall be permitted to apply to the Court for a modification in support based upon changed circumstances. The exception to this provision would be a severe, catastrophic injury to [defendant] which rendered him completely and permanently disabled, with no ability to secure comparable employment.
>
> [(Emphasis added).]

The parties agreed that they each would be responsible for their own debts, and noted several judgments entered or pending against defendant, including an $80,000 debt to the IRS and a business-related judgment "for over one million dollars," all of which defendant incurred without plaintiff's

knowledge or consent. As stated in paragraph twenty-eight of the PSA, plaintiff "expressly objected to certain conduct and decisions made by [defendant], many of which she became aware of after the fact."

With respect to life insurance, the parties agreed that "[u]ntil the children are emancipated," defendant "will maintain his $1,600,000.00 life insurance policy with [plaintiff] as the named beneficiary." "Thereafter, [defendant] will maintain a minimum of $1,000,000.00 in life insurance naming [plaintiff] as sole beneficiary." "The parties agree[d] to review life insurance when [defendant] reaches the age of sixty-five," and "[a]t that time, the parties may modify the life insurance amount in writing so long as the parties agree."

The final two sections of the PSA are entitled "support disclaimer" and "miscellaneous provisions." Paragraph thirty-two provides:

> The parties expressly acknowledge[d] that they did have assets during the marriage, all of which were depleted without [plaintiff's] knowledge or consent, by [defendant]. [Defendant] has agreed to provide support as outlined herein to allow [plaintiff] and [the] children to enjoy the standard of living enjoyed during the marriage, since there is nothing left for equitable distribution, thereby causing [defendant] to have no wherewithal to maintain same independently.

A-4634-17T3

The PSA also stated that the parties "mutually acknowledge[d] that the provisions of this Agreement are deemed by them to be fair, adequate, and satisfactory to each of them in all respects," and that:

> This Agreement may be modified in any respect by the mutual consent in writing of both [defendant] and [plaintiff], or by any court having proper jurisdiction in the matter to modify of the terms of this Agreement because of the substantially changed circumstances of either party.

The parties lived together for approximately two years following the divorce before separating. In an April 12, 2010 order, the court established defendant's alimony obligation at $1600, with a $4800 total support obligation, but at some point thereafter the parties agreed to a fixed total payment of $4300, with $1433 per month allocated for tax purposes as alimony and $2867 per month as child support. In a May 14, 2010 order, the court awarded defendant residential custody of the parties' children and terminated his child support obligations effective February 23, 2010.

In a July 21, 2011 order, the court referred "various issues" to binding arbitration, including the amount defendant was obligated to pay to plaintiff under the PSA's alimony provision and the amount, if any, of child support plaintiff would have to pay in light of the change in residential custody of the children. After arbitration proceedings in December 2011, the arbitrator

rendered a decision on March 23, 2012, and concluded that defendant's annual income was approximately $150,000, and plaintiff's annual income was $42,000. In addition, the arbitrator found that because the parties' youngest child was not yet emancipated, defendant's alimony was to remain at one-third of the total support obligation, or $1433, until that child's emancipation. The arbitrator further determined that under the Child Support Guidelines, plaintiff was obligated to pay defendant $832 per month in child support.

In a July 27, 2012 order, the court adopted the findings and conclusions of the arbitrator and required defendant to pay a net $601 per month in alimony (his $1433 alimony obligation minus plaintiff's $832 child support obligation). The parties engaged in further litigation regarding child support, alimony, and college expenses throughout 2013. An October 8, 2013 order readjusted the child support obligation by fixing the support for both children at $1273 per month, with plaintiff paying $445.55 per month. The parties were each required to pay various college expenses for both of their children, and defendant's alimony obligation of $1433 remained intact, but was offset by

A-4634-17T3

plaintiff's $445.55 child support obligation and $416.66 in college expenses, netting defendant's alimony obligation to $570.79,[1] retroactive to March 2013.

By order dated June 27, 2014, the court emancipated the parties' eldest child retroactive to the date of his college graduation, May 23, 2014. Child support was unchanged because the youngest child was not emancipated and "the parties failed to provide the [c]ourt with sufficient income information to recalculate support" for him.

The parties' youngest child graduated from college on December 15, 2016. On or about January 21, 2017, plaintiff filed a motion to emancipate that child, terminate her child support obligations, and enforce litigant's rights. Defendant filed a cross-motion dated March 16, 2017, seeking, among other things, a reduction in his alimony and life insurance obligations.

In a March 16, 2017 certification, defendant certified that he lost his job in November 2016, and was earning $120,000 per year as of November 2016. Defendant also certified that he was hired by a new employer in February 2017 "where [he] currently earn[s] $96,000.00 per year."

---

[1] The October 8, 2013 order miscalculated defendant's net alimony obligation court at $560.79, as opposed to $570.79. At a plenary hearing that began on March 12, 2018, see infra at p. 11, plaintiff testified that she was receiving $560 per month in alimony at that time. Neither party raised the October 8, 2013 order's mathematical error as an issue before the trial court or on appeal.

A-4634-17T3

By order dated March 31, 2017, the court declared the parties' youngest son emancipated retroactive to his college graduation date, December 15, 2016, and terminated plaintiff's child support obligation. The court "reserve[d] the issues of termination/reduction of [d]efendant's alimony obligation, termination/reduction of the life insurance policy amount, and any credit to [d]efendant's arrears for a [p]lenary [h]earing" scheduled for July 14, 2017.

The July 14, 2017 plenary hearing apparently was stayed to permit defendant to file a Chapter 13 bankruptcy petition, which he filed in October 2017. In the interim, the parties participated in a case management conference, after which the court entered a November 28, 2017 order requiring discovery, and rescheduling the plenary hearing for March 9, 2018.

Defendant filed a case information statement (CIS) dated November 28, 2017, which stated that his gross earned income in 2016 was $116,000. The plenary hearing was reassigned to a different judge, and the first day of the hearing was March 12, 2018. At that time, plaintiff was receiving $560 per month in alimony, and sought an award in the amount of $2150.

Plaintiff, who appeared pro se, testified that her current annual income is $47,000, the same amount she earned in 2017. She also explained that she spends between $50 and $100 per week on food, living mostly on "apples,

peanut butter and frozen food, because it's cheapest," and the total of her monthly expenses was $4142.

She testified that she purchased a new home in October 2016 after moving out of the marital residence and living with her sister for months. To afford the down payment, plaintiff withdrew funds from "small 401K's," which triggered closing penalties, received a contribution from her sister, and used the security deposit that her former landlord refunded to her. According to plaintiff, she has approximately $2000 between her two bank accounts in any given month and can "barely" cover her expenses at the end of each month. With respect to the inclusion of the life insurance provision in the PSA, plaintiff testified that "[defendant] acknowledge[d] that he liquidated all of [their] personal retirements and everything else," so "the reason for that amount was for the purpose of making sure that [she] would be okay."

Defendant testified that he has not earned $150,000 since the arbitration hearing. According to defendant, he had "been able to make the payments up until last year, when [his] income was even more severely reduced." Specifically, defendant testified that he earned $116,000 in income in 2016, then began working for a new company in 2017, who later "cut [his] salary in half," to his current income of $48,000 per year.

A-4634-17T3

Defendant stated that after his salary decreased, he began searching for "alternative employment" and was "sent" other business "opportunities" that would pay on a commission basis, but he was not inclined to pursue those opportunities because he "need[s] to find a salary job." When plaintiff asked defendant why thirty years of sales experience in the same industry was insufficient experience to accept employment on a commission-basis, defendant stated that, although he did not have a non-compete clause or "exclusivity and a radius clause" in any contract with his employer, it nevertheless "would be inappropriate."

Defendant further testified that he currently lives with his new wife in a home she acquired prior to their marriage, that he is "not responsible for any of the mortgage," which costs $3200 per month, but has an "agreement" with his wife to contribute $1300, though he admittedly has "been providing a little less than that" as of the plenary hearing. Defendant also stated that his wife recently financed a $120,000 addition to the home. In addition, he testified that he takes approximately one vacation per year, flew to Barcelona with his wife in October 2016, and they spent $6000 on a return cruise from Barcelona to Florida. Further, defendant stated that he flew to Chile, Dubai, and

12

Pakistan for business trips in 2016, and has traveled to France and Mexico for business as well.

Defendant acknowledged that his income had been declining "for many years," but did not "pull back on the lifestyle and luxurious things" that he was doing "in a quick enough fashion," and generally conceded that he was "living beyond his means" for years. Specifically, defendant admitted that as his income reduced, he "maintained [his] lifestyle [by] using credit cards" and recognized that it was "inappropriate to do so . . . ."

In a May 14, 2018 order, the court denied defendant's cross-motion to terminate his alimony obligation and ordered him to pay plaintiff $2150 per month retroactive to December 15, 2016, "pursuant to the terms set forth" in the PSA. In addition, the court denied defendant's application to modify his life insurance obligation and ordered that he maintain a one-million dollar life insurance policy with plaintiff as the beneficiary "until death." In an accompanying written opinion, the court noted that defendant's testimony "underscore[d] various representations made in the parties' PSA, establishing that the defendant was singularly responsible for depleting the marital assets without plaintiff's knowledge or consent."

The court found defendant's decision to deplete the marital assets without plaintiff's knowledge or consent was "one of the bases for the amount and duration of alimony." The court characterized plaintiff's testimony as "credible," and found that "she has struggled since the divorce to live within her means and maintain a lifestyle that appears to be significantly below that of the marriage." In that regard, the court noted that for "a period of time after the divorce [plaintiff] lived with her sister," had to pay taxes and penalties for withdrawing from her "small" 401K to purchase a condominium. In addition, the court noted that plaintiff could not afford to hire an attorney in this matter.

Further, the court found that plaintiff's monthly expenses were "modest," with $4142 in total monthly expenses and $400 on food and household supplies, and was earning $47,000 annually. The court stated that plaintiff was "forthright, honest and responsible," and "believable in her testimony that, at the end of the month, she can barely meet her expenses." Accordingly, the court determined that "there is no basis from these facts to modify the alimony, which is, under the terms of the PSA, required to be $2150 (one half of the monthly amount of $4300 based upon the emancipation of the parties' youngest child)."

Moreover, the court determined that "defendant filed this application prematurely (four months after he allegedly lost his job in November 2016 when he was required by the terms of the PSA to wait one year)." In addition, the court concluded that defendant "failed to prove modification was warranted under the clear language of the agreement," and the court was "not satisfied, based upon the proofs, that [defendant] has conducted" his job-seeking efforts "in good faith nor over the requisite period of time (one year)."

The court also found "evidence that [defendant's] own lifestyle is being enhanced by virtue of the assistance of his new wife, including that his mortgage contribution is discretionary," and found that defendant has "continued to travel, including a cruise from Barcelona, trips to Florida, and business trips to Mexico, France, Chile, India, Dubai, and Pakistan." Meanwhile, the court noted, "plaintiff has struggled with a standard of living below that of the marriage for years." Accordingly, the court denied defendant's application to modify or terminate his alimony and life insurance obligations, and granted plaintiff's application to enforce the PSA. Defendant's appeal followed.

On appeal, defendant first argues that the court abused its discretion by "denying [his] application for a downward modification of alimony without

15

the appropriate analysis of his ability to pay the support in place at the time of his application." According to defendant, he satisfied "his burden by establishing that there was a substantial change in circumstances, which the [t]rial [c]ourt failed to adequately consider and address," and the court "partially erred by failing to conduct an analysis consistent with" the analysis contemplated by Rule 5:25-3(c)(10)(B) for Child Support Hearing Officers. Next, defendant claims that the trial court committed error by requiring him to provide life insurance "[un]related to any alimony obligation," contrary to the terms of the PSA. We disagree with all of defendant's substantive contentions but remand for the limited purpose for the court to issue an amended order that removes the phrase "until death" from the provision of the May 14, 2018 order pertaining to life insurance.

## II.

The decision whether to modify a party's alimony obligation "based upon a claim of changed circumstances rests within a Family Part judge's sound discretion." Larbig v. Larbig, 384 N.J. Super. 17, 21 (App. Div. 2006). Appellate courts review that decision for an abuse of discretion, Rolnick v. Rolnick, 262 N.J. Super. 343, 359-60 (App. Div. 1993), which "arises when a decision is 'made without a rational explanation, inexplicably departed from

16

established policies, or rested on an impermissible basis.'" Milne v. Goldenberg, 428 N.J. Super. 184, 197 (App. Div. 2012) (quoting Flagg v. Essex Cty. Prosec., 171 N.J. 561, 571 (2002)). The trial court's factual findings "are binding on appeal when supported by adequate, substantial, credible evidence," Cesare v. Cesare, 154 N.J. 394, 411–12 (1998), but its legal conclusions are subject to de novo, "plenary review." Milne, 428 N.J. Super. at 197. Finally, "'substantial weight' must be given to the judge's observations of the parties' 'demeanor, comprehension and speech' when they appeared before the court . . . ." Rolnick, 262 N.J. Super. at 360 (quoting Barrie v. Barrie, 154 N.J. Super. 301, 307 (App. Div. 1977)).

The party "seeking modification of an alimony award . . . must demonstrate that changed circumstances have substantially impaired the ability to support himself or herself." Lepis v. Lepis, 83 N.J. 139, 157 (1980). "When support of an economically dependent spouse is at issue, the general considerations are the dependent spouse's needs, that spouse's ability to contribute to the fulfillment of those needs, and the supporting spouse's ability to maintain the dependent spouse at the former standard." Id. at 152. "In an application brought by a supporting spouse for a downward modification in alimony . . . the central issue is the supporting spouse's ability to pay." Miller

A-4634-17T3

v. Miller, 160 N.J. 408, 420 (1999). "[T]he changed-circumstances determination must be made by comparing the parties' financial circumstances at the time the motion for relief is made with the circumstances which formed the basis for the last order fixing support obligations." Beck v. Beck, 239 N.J. Super. 183, 190 (App. Div. 1990).

### III.

We disagree with defendant's assertion that the court improperly denied his application for a downward modification of alimony. A proper factor for courts to consider when determining whether changed circumstances warrant modification of support is the income the supporting spouse "could derive from personal attention to business . . . ." Lepis, 83 N.J. at 150 (quotation omitted). In addition, "[c]ourts have consistently rejected requests for modification based on circumstances which are only temporary . . . ." Id. at 151. Here, the trial court was "not satisfied, based upon the proofs," that defendant conducted his job search "in good faith nor over the requisite period of time (one year)." The record amply supports these findings.

For example, defendant testified that it "would be inappropriate" to pursue a commission-based sales job in an industry in which he has thirty years of experience, when such opportunities have been "sent" to him, simply

18

because he "need[s] to find a salary job." In addition, the PSA itself established a requirement for a good faith job search, i.e., that defendant search for jobs with commensurate pay for one full year prior to filing a motion for modification. In light of defendant's failure to abide the PSA's requirement or otherwise search for jobs with commensurate pay in good faith, the trial court did not abuse its discretion in concluding defendant failed to show a permanent change in circumstances warranted modification of alimony.

In addition, the last order setting defendant's alimony obligation was the July 27, 2012 order, at which time defendant was earning $150,000. As the trial court found, defendant testified that his income in 2016 was $116,000, and he "alleged to be making $48,000" at the time of the 2018 hearing. However, defendant testified that he had "been able to make the payments up until" 2017 and certified when he filed his March 16, 2017 cross-motion for modification that his annual income was $96,000. It is unclear from the record when that income was allegedly "cut . . . in half" by his employer.

Thus, between July 2012 and March 2017, the relevant timeframe for the court to consider, see Beck, 239 N.J. Super. at 190, plaintiff's income decreased by approximately $50,000. While that is one changed circumstance,

the court's finding that defendant no longer has to pay for his mortgage, which enhances his ability to pay other expenses, is fully supported by the record.

Nonetheless, defendant maintains that the court "failed to take into consideration [p]laintiff's actual needs when ordering an increase in [d]efendant's alimony payment to [p]laintiff, over and above any amount of alimony that [p]laintiff has ever received from [d]efendant." We disagree.

The trial court specifically found that plaintiff "has struggled with a standard of living below that of the marriage for years," and that defendant's lifestyle had actually been "enhanced" because he was only required to contribute to the mortgage at his new wife's discretion. These findings are supported by plaintiff's testimony, which the trial court found "credible," and defendant's testimony regarding his new wife's discretion over whether he must contribute to the mortgage. Further, plaintiff testified that she has been living mostly on "apples, peanut butter and frozen food, because it's cheapest," while defendant stated he has been taking trips around the world for business and pleasure with his new wife, including a cruise from Barcelona to Florida.

Moreover, while it is true that defendant has not had to pay $2150 specifically in alimony prior to the court's decision, the PSA provides that "[u]pon the emancipation of the second child, [defendant] shall continue to pay

20

an amount equal to one half of the overall total amount he had been paying (above), as and for permanent alimony." The trial court enforced the clear language in the PSA awarding one-half of the $4300 total amount, or $2150, to plaintiff as permanent alimony. Because defendant failed to show a permanent change of circumstances precludes him from satisfying that obligation, or that he made a good faith effort to secure comparable employment, the court's decision respecting alimony must be affirmed. See Smith v. Smith, 72 N.J. 350, 360 (1977) ("In each case the court must determine what, in the light of all the facts presented to it, is equitable and fair, giving due weight to the strong public policy favoring stability of arrangements.").

IV.

Defendant also argues that the trial court "abused its discretion by determining that [he] would have a lifetime" life insurance "obligation to [p]laintiff with a death benefit of one million dollars, without any determination that this obligation is related to any alimony obligation, when the intention of the parties' agreement was for life insurance to relate to [d]efendant's alimony obligation alone." According to defendant, plaintiff failed to "provide any proof supporting the notion that the life insurance is in place for any reason other than as security for [d]efendant's alimony

21 A-4634-17T3

obligation."  After considering defendant's argument, we remand for the limited purpose for the court to enter an amended order that comports with the language of the PSA.

We recognize that "[l]ife insurance policies are frequently included in final judgments of divorce as security for support obligations."  Schwarz v. Schwarz, 328 N.J. Super. 275, 286 (App. Div. 2000).  Here, though, plaintiff testified that the reason for the one-million dollar life insurance policy was to "compensate [her] for walking away with nothing . . . but debt" after defendant dissipated all of the marital assets without plaintiff's knowledge or consent.  The court found plaintiff was a credible and honest witness, and the unequivocal support disclaimer in the PSA corroborates her testimony.

Specifically, plaintiff's testimony indicates that the parties intended for defendant's life insurance policy to serve as a form of deferred distribution of the value of plaintiff's share of the marital assets, all of which defendant "expressly acknowledge[d]" in the PSA to have depleted without plaintiff's consent.  Tellingly, the only bright-line figure in the PSA regarding the parties' support and equitable distribution scheme is the life insurance provision, as the PSA did not establish a dollar figure for alimony or child support, and defendant's unilateral actions left "nothing . . . for equitable distribution,

thereby causing [plaintiff] to have no wherewithal to maintain" her marital standard of living independently.

Thus, it is clear from the PSA and plaintiff's testimony that the parties agreed that a $1,000,000 life insurance policy would be fair and equitable to secure defendant's alimony obligation and to cover plaintiff's portion of the squandered marital assets. Cf. Kothari v. Kothari, 255 N.J. Super. 500, 510 (App. Div. 1992) ("Where property has been dissipated during the marriage the asset subject to distribution may take the form of a cash indebtedness to be imposed by the court upon one spouse in favor of the other."); N.J.S.A. 2A:34-23.1(i) ("[i]n making an equitable distribution of property, the court shall consider . . . [t]he contribution of each party to the . . . dissipation . . . in the amount or value of the marital property"); Monte v. Monte, 212 N.J. Super. 557, 567-68 (App. Div. 1986) ("intentional dissipation" of marital assets is a "fraud on marital rights" (quotation omitted)). Under these unique circumstances, the trial court did not abuse its discretion in deciding not to modify the amount of defendant's life insurance obligation. See Larbig, 384 N.J. Super. at 21 ("[E]very motion to modify an alimony obligation 'rests upon its own particular footing and the appellate court must give due recognition to the wide discretion which our law rightly affords to the trial judges who deal

23

with these matters.'"  (quoting <u>Martindell v. Martindell</u>, 21 N.J. 341, 355 (1956))); <u>see</u> <u>also</u> <u>Smith</u>, 72 N.J. at 361 ("Assets acquired by the joint efforts of the parties while the shared enterprise continues, should be, on its termination, eligible for equitable distribution.").

Nevertheless, the court departed from the terms of the PSA with respect to the term of life insurance.  Specifically, the PSA provides that the life insurance obligation would be reviewable and potentially modifiable by the parties when defendant reached sixty-five years of age.  The court's May 14, 2018 order, however, requires defendant to maintain life insurance "until death."  Because the "until death" language departs from the plain language of the PSA, we issue a limited remand with respect to the life insurance issue with narrow instructions to modify the order to remove the "until death" language, and instead provide that defendant should maintain life insurance with plaintiff as the beneficiary in accordance with the language of the PSA.

To the extent we have not specifically addressed any of defendant's remaining contentions, it is because we find they have insufficient merit to warrant discussion in a written opinion.  <u>R.</u> 2:11-3(e)(1)(E).

Affirmed in part and remanded in part.  We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION