212 N.J. Super. 557 (1986)
515 A.2d 1233
NICHOLAS R. MONTE, JR., PLAINTIFF-APPELLANT,
v.
VIRGINIA MONTE, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued May 28, 1986.
Decided July 16, 1986.
*560 Before Judges MICHELS, GAULKIN and DEIGHAN.
Schachter, Cohn, Trombadore & Offen, for plaintiff-appellant (John J. Trombadore, on the brief).
Wilentz, Goldman & Spitzer, for defendant-respondent (Bonnie S.M. Reiss and Jean R. Campbell, on the brief).
DEIGHAN, J.A.D.
Plaintiff Nicholas R. Monte, Jr., appeals from an award of equitable distribution and support in a final divorce judgment entered on December 12, 1984. The trial court divided the assets equally but did not obligate defendant Virginia Monte to repay loans from plaintiff's family. Also, $250 per week was awarded for unallocated support of defendant and Kristine, the parties' 17 year old daughter who was living with defendant. The parties had been in financial straits, not only at the time of the divorce, but for several years prior thereto. Plaintiff's real estate business had been failing for many years and he borrowed excessively; at the time of the divorce the debts apparently exceeded the marital assets, and many of the outstanding obligations were to plaintiff's family. Defendant claimed she had no knowledge of and received no benefit from any of the funds borrowed from plaintiff's family.
On this appeal plaintiff contends that the trial court (1) failed to make findings of fact and conclusions of law to support its determinations; (2) failed to apply proper legal standards for apportionment of the marital debts in holding him solely responsible for the loans, and (3) erred in awarding defendant alimony where the record indicates that her earnings were comparable to those of plaintiff and that she was essentially self-sufficient.
Subsequent to this appeal, defendant moved to enforce litigant's rights and plaintiff responded with a cross motion for discovery of defendant's financial circumstances, for an order to compel defendant to file a case information statement and for a plenary hearing on support and defendant's needs. After *561 a hearing on May 15, 1985, the trial court both granted and denied the defendant's applications and denied all of the applications of plaintiff. On this appeal, defendant filed an appendix which consists of the transcript of the hearing on the motions held May 15, 1985 and submits that the transcript is a part of the record because the trial court "continued its jurisdiction of this matter, and as such the record below was expanded." Plaintiff vigorously objects to the use of the motion transcript to supplement the record to defeat his contentions that the trial court failed to make findings of fact and conclusions of law in support of its determinations. From our review of the transcript of the hearing held on May 15, 1985, there is no indication that the trial court was elaborating on the determinations made at the original divorce hearing. Also, no statement was filed after a notice of appeal was served upon the trial court. R. 2:5-1(b). Although the trial court retains jurisdiction, R. 2:9-1(a), to enforce judgments and orders pursuant to R. 1:10, nevertheless defendant failed to move to supplement the record as required by R. 2:5-5(a).
We deem it unnecessary to pass upon the issue of whether the transcript hearing on May 15, 1985 to enforce litigant's rights is a part of the record. The facts developed at the enforcement hearing are not relevant to the issue of equitable distribution. Unlike an award of alimony which can be adjusted after divorce to reflect unanticipated changes in the parties' circumstances, a property division or equitable distribution may not be adjusted. Mahoney v. Mahoney, 91 N.J. 488, 498 (1982). Further, in our view, the findings and conclusions, even as supplemented, are deficient.
The parties were married on November 16, 1957 and two daughters, Karen and Kristine, who at the time of the divorce hearing were 23 and 17 years of age respectively, were born of the marriage. Plaintiff, who was engaged in various aspects of real estate transactions throughout the marriage, purchased a real estate corporation known as L & M Realty in 1967. All *562 shares of stock of the corporation were either issued or transferred to him. The real estate office was located in a building owned by plaintiff and defendant.
Initially, the business prospered and in 1974 two additional offices were opened but were subsequently closed the following year because they were a financial detriment. Plaintiff ascribes financial difficulties of his real estate business to a general depression in the real estate market and a prolonged illness which befell him in 1978. In that year he came down with what was later diagnosed as a hymoglebic migraine, causing him to be hospitalized and unable to work for over one year. L & M was struggling and, although plaintiff's accountant states in a financial report that plaintiff did not receive any income since 1980, plaintiff contends to have taken no salary from the company since 1979. During most of the marriage plaintiff supported defendant who was a homemaker; however, she was also a bookkeeper for the business for a short time after they were first married. Also, during and after plaintiff's illness she worked at L & M offices on a half-day basis for two or three years. While defendant denies it, plaintiff asserts that defendant kept the books of the company while he was ill.
Beginning in the late 1970's plaintiff began to borrow money heavily and, up to the time of the separation between the parties, had borrowed large sums of money from banks, friends, relatives and mortgage companies. He testified that he borrowed for personal reasons as well as business. Plaintiff contends that he borrowed an aggregate of approximately $58,000 from various members of his family. He also borrowed $5,500 against a life insurance policy. At the time of the trial there was an outstanding judgment against plaintiff and defendant in the sum of $6,000 for loans from plaintiff's mother and sister. These obligations were eventually satisfied out of the proceeds of the sale of the marital home.
While none of the loans from plaintiff's family were evidenced in writing, plaintiff nevertheless testified that he agreed *563 to repay the loans to members of his family if he sold his business or office building or if he got on his feet again financially. Plaintiff indicated that all the funds from the various loans were deposited in a joint-checking account in a bank in Edison in the names of both parties and were used for family expenses. However, he could not recount which expenses had been paid with the money from those loans.
Defendant sought to relate the increased borrowing to an extramarital affair plaintiff was having with an employee. She produced letters written in 1980 indicating that the employee became pregnant and that plaintiff had set aside $5,000 for himself and the employee. Plaintiff admitted to having an affair and conceded that he had taken the employee to Vermont and may have given her gifts but he denied that any children were born from that relationship.
The trial court found, among other things, that the first and second mortgages on the marital home and the judgment resulting from the loans to defendant's family were the responsibility of both parties. These debts were paid out of the proceeds of the sale of the marital home. The court also held that defendant should not be charged with the debts to plaintiff's family or a debt to Commercial Trust:
Any remaining monies are to be divided 50% Mrs. Monte and 50% Mr. Monte. I specifically find that all the debts incurred by Mr. Monte to members of his family are not charges against Mrs. Monte's share in the sale of the proceeds of the house. Given the marital history between these people, certainly she should have been told; she says she wasn't and I find as a matter of fact she was unaware of the encumbrancing of her marital assets. The only note she was aware of was one to one bank and she did not consent to the extension of that note and she alleged that they were not her signatures on the extension. Therefore I do not hold it as a debt of hers. Her husband chose to continue the extension for his own purposes, all be it to keep his business going and whatever else had had going.
The trial court's reference to a loan from Commercial Trust, which defendant originally agreed to but did not consent to any extensions, is apparently irrelevant as it appears that the loan had already been repaid. There was no mention made by the trial court concerning other outstanding obligations such as *564 department store accounts, purchases for personal purposes, credit card balances, a life insurance loan or a boat loan, all of which plaintiff contends should have been charged to both parties. From the accountant's report dated March 19, 1984, attached to plaintiff's preliminary disclosure statement, it appears that there were $11,643 of accounts payable for credit card obligations and general creditors including an estimate of $5,000 for professional fees. No explanation is made concerning the professional fees. In addition, plaintiff's financial statement itemizes loans and notes payable to persons other than banks amounting to $82,245 and loans and notes payable to banks in the sum of $10,810.

I.
The final judgment of divorce entered December 12, 1984, allocates certain debts such as the first and second mortgages as well as other obligations to be the responsibility of both parties but provides that the defendant shall not be charged for the debts to plaintiff's family. The judgment further allocated a debt for a Cadillac to be the responsibility of plaintiff but made no itemization as to the nature and amount of other debts or other obligations. As to assets, there is a mention of furniture and furnishings with a direction that if the parties do not agree as to the division of these assets they are to make an inventory with a valuation of items and "the value shall be averaged" with the parties to choose from the list those items each desire.
From our review of the record, it appears that the trial court failed to make findings of fact concerning the three step procedure to determine equitable distribution as enunciated in Rothman v. Rothman, 65 N.J. 219, 232 (1974). The trial court must: (1) identify the specific property determined to be subject to equitable distribution; (2) determine the value of each asset, and (3) equitably distribute the assets. Further, in Painter v. Painter, 65 N.J. 196, 211 (1974), the Court listed 13 factors to be considered in determining the manner in which distribution *565 may be fairly made. The failure to properly identify and explain the use of guideline criteria in determining equitable distribution in itself will justify a reversal. Grayer v. Grayer, 147 N.J. Super. 513, 516 (App.Div. 1977).
From our careful review of the record, the trial judge did not make adequate findings of fact and conclusions of law to enable us to review his determinations.
R. 1:7-4 requires a trial court in a nonjury civil trial to find the facts as well as to state conclusions of law. Naked conclusions do not satisfy the purpose of the rule. Curtis v. Finneran, 83 N.J. 563, 570 (1980). Rather, the trial judge must state clearly the factual findings and correlate them with relevant legal conclusions, ibid. See State v. Singletary, 165 N.J. Super. 421, 424-425 (App.Div. 1979), certif. den. 81 N.J. 50 (1979), so that parties and the appellate courts may be informed of the rationale underlying the conclusion. Esposito v. Esposito, 158 N.J. Super. 285, 291 (App.Div. 1978). This requirement is particularly applicable to matrimonial cases. Harmon v. Harmon, 161 N.J. Super. 206, 211 (App.Div. 1978); Grayer v. Grayer, supra; Wertlake v. Wertlake, 137 N.J. Super. 476, 485 (App.Div. 1975). Without such findings it is impossible for an appellate court to perform its function of deciding whether the determination below is supported by substantial credible proof on the whole record. Mol v. Mol, 147 N.J. Super. 5, 9 (App.Div. 1977); Kenwood Assocs. v. Bd. of Adj. Englewood, 141 N.J. Super. 1, 4 (App.Div. 1976). Trial judges should always state their reasons so that counsel and an appellate tribunal may be fully informed. McCann v. Biss, 65 N.J. 301, 304 n. 2 (1974). A mere recitation of factors considered is not sufficient. Grayer 147 N.J. Super. at 516.

II.
Even though both parties were aware of their financial problems, their standard of living during the marriage apparently did not suffer. In 1978 they had a home custom built and *566 purchased a boat for about $13,000; they finished off their basement in 1979; they took ski vacations, hired a gardener, purchased a horse for one of their daughters, and defendant took a trip to Israel.
The parties' affluent standard of living continued not only during periods of time when earned income was meager but also during the period of time in 1978 when plaintiff had no income because he was unable to work for over a year. Defendant during this time was aware of the lack of income, and must have been as equally aware that since monies were spent for every day living expenses without any income, it was necessary to borrow funds upon which to subsist.
In New Jersey, while the determination, valuation and distribution of marital assets have been developing by case law, there is a dearth of law concerning the payment of marital debts. In some instances, it is indicated that the marital debts may be deducted from the total value of the marital estate, Pascarella v. Pascarella, 165 N.J. Super. 558, 563 (App.Div. 1979) (net value of assets is subject to equitable distribution), or the debts may be allocated separately to reduce any monetary award payments. See Ionno v. Ionno, 148 N.J. Super. 259, 262 (App.Div. 1977) (although this court indicated that the debts should be allocated between the husband and wife, the facts do not indicate whether there was any marital estate from which to pay the outstanding liabilities). The allocation of debts depends on the circumstances in the particular case. In some cases the two methods may reach the same result, but not in a case where, as here, the total liabilities are greater than the total assets.
During the trial the court framed the issue concerning the debts thusly: If defendant saw the debt built up throughout the marriage and participated in the encumbrances, she was subject to sharing in the liability; however, if the evidence showed that her husband's debts were incurred during the breakup of the marriage "in an attempt to undermine her equity in the marital *567 home," she would not be liable. At the end of the trial the judge explained his reason for finding that defendant was not responsible for her husband's debts to his family:
Given the marital history between these people, certainly she should have been told; she says she wasn't and I find as a matter of fact she was unaware of the encumbrancing of her marital assets.
The court also stated that some of the "debts were encumbered by Mr. Monte on behalf of L & M to keep it in business."
The trial court's approach to the allocation of debts is supported by judicial authority. In Schweizer v. Schweizer, 301 Md. 626, 484 A.2d 267 (1984), the court distinguished between marital debts, which are directly traceable to the acquisition of marital property, and nonmarital debts which are not. If marital, the debts are subtracted from the total value of the marital property before distribution. If nonmarital, they are taken into account as a reflection of the party's economic circumstances when the court determines the amount and method of payment of the award. Id. at 637, 484 A.2d at 272. Even if debts are determined to be marital, they could be allocated to one party based upon his or her greater earning potential. See Painter v. Painter, 65 N.J. at 211.
Generally speaking, in dividing marital assets the court must take into account the liabilities as well as the assets of the parties. Finley v. Finley, 422 N.E.2d 289, 295 (Ind. Ct. App. 1981). In other words, if the assets are to be divided between the parties, the debts incurred in obtaining those assets should likewise be allocated between the parties. Hansen v. Hansen, 302 N.W.2d 801 (S.D. 1981). However, it may not be an abuse of judicial discretion to divide the assets of the parties equally without requiring them to share the debts. Levy v. Levy, 277 S.C. 576, 291 S.E.2d 201 (1986).
In a situation such as present here, plaintiff had the burden of establishing the traceable debts. Sharp v. Sharp, 58 Md. App. 386, 398 (1984). However, if the debt resulted because the husband intentionally dissipated marital assets "such intentional *568 dissipation is no more than a fraud on marital rights," and the debt will not be charged to the wife. Ibid. See Klingberg v. Klingberg, 68 Ill. App.3d 513, 25 Ill.Dec. 246, 386 N.E.2d 517 (1979) (dissipation found where husband used marital property for his own benefit for a purpose unrelated to the marriage at a time when the marriage was breaking down); In re Marriage of Sevon, 117 Ill. App.3d 313, 73 Ill.Dec. 41, 453 N.E.2d 866 (1983) (no dissipation where no evidence in record to indicate that wife spent the money for purposes unrelated to the marriage). In these cases the courts did not place any emphasis on the knowledge or awareness of the "victim" spouse concerning the loans but rather were primarily concerned with the purpose for which the monies were borrowed and spent.
Defendant questions whether the loans from plaintiff's family are bona fide. Also, plaintiff indicated that he was not required to repay the loans until he sold the business or office building or became financially able. Under these circumstances it would not be equitable to require defendant to be charged with any portion of the loans if plaintiff is not likewise required to pay. Moreover, absent a finding as to whether the debts to plaintiff's relatives did or did not exist, it may be necessary for those relatives to establish the basis and amount of the debts. See Biddle v. Biddle, 166 N.J. Super. 1, 6-7 (App.Div. 1979); Lee v. Lee, 133 Ariz. 118, 123, 649 P.2d 997, 1002 (Ct.App. 1982) (court had no authority to order direct payment of contested debt from community assets where the husband contended that the debt to his wife's mother, who had not intervened in the action, had been forgiven).
We do not know, and thus cannot review, the trial judge's reasons for his allocation of the debts. The judge may have concluded that plaintiff had failed to sustain his burden of proving the fact and nature of the alleged debts; on the other hand, he may have concluded that the debts had been proved in whole or in part but that they should be allocated to plaintiff *569 for reasons which were unarticulated. We have no alternative but to remand the matter so that the trial judge can determine, upon proper findings of fact and conclusions of law, the existence, nature, extent and allocation of the debts alleged by plaintiff.

III.
Plaintiff argues that the trial court overestimated his earning capacity and underestimated defendant's earning ability. The divorce judgment awarded $250 per week unallocated support for defendant and Kristine, the parties' 17 year old daughter who was living with defendant at the time of the divorce hearing. At the time of the enforcement proceedings on May 15, 1985 it appears that the daughter, who was then 18 years old, was not living with defendant.
In Lepis v. Lepis, 83 N.J. 139 (1980), the Supreme Court summarized the general considerations in determining alimony and support as stated in N.J.S.A. 2A:34-23: (1) the dependent spouse's needs, (2) the dependent spouse's ability to contribute to the fulfillment of those needs, and (3) the supporting spouse's ability to maintain the dependent spouse at the former standard. In child support the general considerations are the child's needs and the supporting spouse's ability to contribute to the fulfillment of those needs. Id. at 152. Nevertheless, in Lepis we are instructed to take a "closer look ... at the supported spouse's ability to contribute to ... her own maintenance." 83 N.J. at 155. The court also stated that "[t]he extent of actual economic dependency, not one's status as a wife, must determine the duration of support as well as its amount." Ibid.
Here, defendant has a marketable skill in bookkeeping which enables her to earn approximately $12,000 gross income per year. Plaintiff apparently was earning $16,900 per year gross at the time of the enforcement hearing. It is a recognized fact that after divorce both parties will often have to "scale down *570 their style of living," Turner v. Turner, 158 N.J. Super. 313, 318 (Ch.Div. 1978), especially where, as here, the "parties were required to spend during coverture practically all of their income, [and then some] with little or no savings." Id. at 317.
While the trial court did not indicate its reasons during the divorce trial, it stated during the enforcement proceedings that it took into consideration plaintiff's skills in real estate and "projected his ability to earn." The trial court felt that defendant was "under utilizing" his skills by only doing appraisals and not selling real estate. The potential earning capacity is doubtless a factor to be considered by a trial court in determining what distribution will be "equitable" and it is even more obviously relevant on the issue of alimony. Stern v. Stern, 66 N.J. 340, 345 (1975). Accord Mahoney v. Mahoney, 91 N.J. at 505; see Bonanno v. Bonanno, 4 N.J. 268, 275 (1950); Lynn v. Lynn, 165 N.J. Super. 328, 340 (App.Div. 1979), certif. den. 81 N.J. 52 (1979); Arribi v. Arribi, 186 N.J. Super. 116, 118 (Ch.Div. 1982) (supporting spouse may not choose to remain in a position where he has a diminished or no earning capacity); 24 Am.Jur.2d Divorce and Separation, § 579 at 588.
The defendant's preliminary disclosure statement (PDS) is dated July 30, 1984. At the conclusion of the divorce hearing the court requested an updated PDS from defendant with an anticipated rental figure for an apartment. From the record before us the PDS was not furnished to the trial court. At the time of the enforcement hearing defendant was apparently living with relatives. For this reason the trial court indicated that the defendant would require $450 to $600 per month for rent and that he based his award of $250 per week on that contingency. At the enforcement proceeding the court denied plaintiff's applications for a hearing on the issue of support and to compel defendant to file a current case information statement.
It is evident from the record that a hearing is required to accurately determine defendant's income and needs. Defendant's *571 PDS indicates expenses of approximately $11,600 per year without an allowance for rent. With a rental allowance of $600 per month or $7,200 per year, defendant's total expenses would be $18,800, which would be more than offset by her net income of $10,000 and support of $13,000 per year.
Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.