**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2795-17T2

RIAD KABAKIBI and LAMA
KABAKIBI, Husband and Wife,
and RIAD KABAKIBI, M.D.,
P.A.,

      Plaintiffs-Appellants,

v.

RAMESH SARVA, C.P.A.,
RAMESH SARVA, C.P.A.,
P.C., and MICHAEL W.
FRANK, F.S.A., M.A.A.A.,

      Defendants-Respondents.

_____

      Argued September 9, 2019 – Decided October 24, 2019

      Before Judges Fasciale, Moynihan and Mitterhoff.

      On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-9757-14.

      Jannat Nalwa argued the cause for appellants (Piekarsky & Associates, LLC, attorneys; Scott B. Piekarsky and Jannat Nalwa, on the briefs).

Kenneth B. Falk argued the cause for respondents (Falk & Flotteron, LLC, attorneys; Kenneth B. Falk and Jacob Davidson, on the brief).

PER CURIAM

Plaintiffs Riad Kabakibi and Lama Kabakibi appeal from an order for judgment dismissing with prejudice their complaint alleging professional malpractice against their accountant, defendant Ramesh Sarva and from the denial of their motion for a new trial. Plaintiffs argue the trial court erred by denying their motion for a new trial and committed trial errors by: failing to set forth findings of fact and conclusions of law in its decision following a bench trial; finding plaintiffs committed tax fraud; failing to find defendant negligently advised them regarding a defined benefit plan (the plan) into which plaintiffs transferred real estate, and that defendant was responsible for the damages—taxes, penalties and interest charged by the Internal Revenue Service (IRS) after an audit of plaintiffs' returns from 2008 through 2011—which plaintiffs incurred as a result of defendant's negligent preparation of plaintiffs' personal and corporate tax returns for Riad's[1] medical practice and inclusion of the improper real-estate contributions to the plan. Because we agree that the trial court erred

---

[1] At times, we refer to the Kabakibis by their given names for purposes of clarity; we mean no familiarity or disrespect by so doing.

by failing in its written decision to set forth its analysis, correlating its findings of facts to the applicable legal principles, consequently supplying ample support to grant plaintiffs' motion for a new trial, we reverse and remand.

In its eight-page written decision following a three-day bench trial, the trial court said it would "deal with the first two audit issues raised in the [IRS] auditor's report," then went on to list five

> items, which increased corporate income in the years in question[:] 1) [a]dditions to income of [the professional corporation] from monies diverted by Lama; 2) [d]isallowed deductions for rent; 3) [d]isallowed expenses from [the professional corporation] that was [sic] never paid; 4) [i]mproper contributions to [the plan] from a real estate transfer; 5) [d]isallowed automobile expenses.

The court then divided its decision into three parts: Diverted Income, Deductions and Pension Plan Deductions.

Under the heading "Diverted Income," the court concluded plaintiffs "wrongfully took" almost $684,000, which the IRS auditor determined was income to the professional corporation, and deposited it in accounts in their individual names in what the court described as part of "a large and willful evasion of paying appropriate taxes." The court found "[p]laintiffs had eight 1099s for the two accounts where the diverted money went" and "[n]one were

A-2795-17T2

ever presented to [defendant]" showing plaintiffs purposely hid their diversion from defendant.

The trial court labeled plaintiffs' deductions for rent and repair expenses "clear tax evasion," finding Lama told the IRS auditor plaintiffs owned the building in which the medical practice was located so no rent was paid, "the utility and the repair expenses were not used for the [professional corporation] but instead for other properties" plaintiffs owned, and that equipment rental expenses were "arguable at best." The court determined, "Lama, by offering no opposition to issues in audit's [sic] disallowed deductions, was conceding that her conduct was wrongful" and "there was no attempt to prove that these additions to income or deductions, which the auditor disallowed, are defensible."

Lastly, the trial court considered evidence relating to the plan and deductions for contributions of real estate in 2008 and 2009 which the auditor—who did not testify—ruled improper. The trial court concluded the IRS "auditor made comments regarding [the plan] but at no time gave any indication that there was anything wrong with [it]. The plan had been approved by the IRS." The court deemed defendant's testimony

> strong evidence that [the plan], for which he listed a deduction and which was approved by the IRS, was

4

proper. He testified that such a plan never created an issue for over 150 clients of his. The auditor's reason for disallowing [the plan] contributions was that there was no cash contributions by the corporation and that [the] transfer was not permitted.

The court found that plaintiffs' expert Frank Brunetti[2] "cleared up the issue" by testifying the 2008 contribution was disallowed because it was not a contribution by the professional corporation, but from a separately owned limited liability company that owned the contributed real estate. The court found "no testimony or evidence that the auditor was concerned with no compensation showed on the 1140[3] of the [professional corporation]." In addressing the 2009 contribution to the plan, the trial court found it was "disallowed solely because [the professional corporation] did not follow [defendant's] instructions in contributing to the payment plan as directed." The court also found plaintiffs' experts, Jay Soled and Brunetti "gave testimony, hinting but never stating, that the [p]lan was improper." The court then rejected Soled's opinion that the plan "deductions were the cause, in any way, of the audit [sic]," and found the "audit was caused

---

[2] We note the trial court, at times, referred to Brunetti as Burnetti.

[3] Plaintiffs contend the trial court's reference to form 1140 is erroneous because the correct designation of the form is 1120.

by the conduct of the [p]laintiffs in diverting [almost $684,000] of corporate income."

Our review of "the findings and conclusions of a trial court following a bench trial are well-established." Allstate Ins. Co. v. Northfield Med. Ctr., P.C., 228 N.J. 596, 619 (2017). While we review the trial court's interpretation of law de novo, Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995), normally:

> [W]e give deference to the trial court that heard the witnesses, sifted the competing evidence, and made reasoned conclusions. Reviewing appellate courts should "not disturb the factual findings and legal conclusions of the trial judge" unless convinced that those findings and conclusions were "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice."
>
> [Allstate Ins. Co., 228 N.J. at 619 (alteration in original) (internal citations omitted) (quoting Griepenburg v. Twp. of Ocean, 220 N.J. 239, 254 (2015)).]

Nor do we "engage in an independent assessment of the evidence as if [we] were the court of first instance," State v. Locurto, 157 N.J. 463, 471 (1999), and will "not weigh the evidence, assess the credibility of witnesses, or make conclusions about the evidence," Mountain Hill, L.L.C. v. Twp. of Middletown, 399 N.J.

Super. 486, 498 (App. Div. 2008) (quoting State v. Barone, 147 N.J. 599, 615 (1997)).

"If we are satisfied that the trial judge's findings and result could reasonably have been reached on sufficient credible evidence in the record as a whole, his [or her] determination should not be disturbed." Pioneer Nat'l Title Ins. Co. v. Lucas, 155 N.J. Super. 332, 338 (App. Div. 1978). "Reversal is reserved only for those circumstances when we determine the factual findings and legal conclusions of the trial judge went 'so wide of the mark that a mistake must have been made.'" Llewelyn v. Shewchuk, 440 N.J. Super. 207, 214 (App. Div. 2015) (quoting N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007)).

Unfortunately, the trial court did not apply any findings of fact to the elements related to plaintiffs' malpractice claim and then make legal conclusions relevant to those elements. In fact, the court's decision does not set forth any legal citation. Rule 1:7-4(a) requires that a trial court "by an opinion or memorandum decision, either written or oral, find the facts and state its conclusions of law thereon in all actions tried without a jury. . . ." "[N]either the parties nor [the court] are well-served by an opinion devoid of analysis or citation to even a single case." Great Atl. & Pac. Tea Co., Inc. v. Checchio, 335

7

N.J. Super. 495, 498 (App. Div. 2000) (emphasis added). "When a trial court issues reasons for its decision, it 'must state clearly [its] factual findings and correlate them with relevant legal conclusions, so that parties and the appellate courts [are] informed of the rationale underlying th[ose] conclusion[s].'" Avelino-Catabran v. Catabran, 445 N.J. Super. 574, 594 (App. Div. 2016) (alterations in original) (quoting Monte v. Monte, 212 N.J. Super. 557, 565 (App. Div. 1986)). When that is not done, a reviewing court does not know whether the judge's decision is based on the facts and law or is the product of arbitrary action resting on an impermissible basis. See Monte, 212 N.J. Super. at 565.

A claim for damages related to professional malpractice accrues when the professional's negligence is the proximate cause of the client's damages. Circle Chevrolet Co. v. Giordano, Halleran & Ciesla, 274 N.J. Super. 405, 413 (App. Div. 1994). "One who undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession in good standing in similar communities." Levine v. Wiss & Co., 97 N.J. 242, 246 (1984) (citing Restatement (Second) of Torts § 299A (Am. Law Inst. 1965)). In Levine, the Court "expressly recognized, and . . . stressed, that an accountant may be held

responsible to those to whom a duty is owed, for failure to adhere to the

[accepted] standards of [conduct for] the profession." Ibid.

In the context of an architectural malpractice case, we recognized:

> In a professional negligence case, the standard of care must normally be established by expert testimony. This is so because a jury should not be allowed to speculate, without expert testimony, in an area where laypersons have insufficient knowledge or experience. Moreover, opinion testimony "must relate to generally accepted . . . standards, not merely to standards personal to the witness." In other words, plaintiff must produce expert testimony upon which the jury could find that the consensus of the particular profession involved recognized the existence of the standard defined by the expert. It is insufficient for plaintiff's expert simply to follow slavishly an "accepted practice" formula; there must be some evidential support offered by the expert establishing the existence of the standard.
>
> [Taylor v. DeLosso, 319 N.J. Super. 174, 179-80 (App. Div. 1999) (internal citations omitted) (quoting Fernandez v. Baruch, 52 N.J. 127, 131 (1968)); see also Skoloff & Wolfe, P.C., 339 N.J. Super. 97, 102-03 (App. Div. 2001) (relating the same tenet to an attorney malpractice action).]

Thus, as with any professional malpractice case, the trial court was

compelled to follow the same analysis we would expect of any trier of fact and

> determine what is standard [accounting] practice from the testimony of the expert witnesses who have been heard in this case. After deciding what the standard of care is, what standard [accounting] practice is in the circumstances of this case, [the trier of fact] must then

9

determine whether defendant has conformed with or whether defendant has departed from that standard of care.

[Model Jury Charges (Civil), 5.51A, "Legal Malpractice" (approved June 1979).]

Although we have quoted the model jury charge for legal malpractice cases, the same analysis is required for accounting malpractice cases for which no model charge exists.

Plaintiffs presented expert testimony from Brunetti and Soled, who testified as to deviations they said defendant committed with regard to the filing of plaintiffs' tax returns and the advice defendant gave to plaintiffs regarding the plan. Soled testified that accountants must prepare tax returns in accordance with standards published by the American Institute of Certified Public Accountants (AICPA), among which is the need to be accurate and proactive, not just scriveners who "take whatever information [their] client says and just put it on a tax return."

Soled testified the fact that the absence of reported salary for a medical specialist such as Riad on the returns "seems on its face to be fundamentally flawed" and that "there seems to be no bridge to be able to make qualified contributions to a pension plan . . . because usually the sine qua non to having bonafide contributions to a pension plan is the receipt of salary." Soled

10

characterized these errors as "egregious flaws . . . on the returns." Soled opined that an accountant "should have [heard] alarm bells going off" when faced with such circumstances and if the returns seemed flawed, the accountant "cannot just point the finger at the client and say . . . he or she or it gave me this information and it's their fault because [an accountant has] to stand behind the work." Soled referenced an AICPA standard in maintaining that an accountant "should make a reasonable effort to obtain from the taxpayer the information necessary to provide appropriate answers to all questions on a tax return before signing as a preparer." He opined the absence of salary "scream[ed] out" that defendant should not have signed the returns without demanding more information from plaintiffs.

He also testified that because no salary was listed, the IRS disallowed the deduction for the plan. Soled offered if the tax returns had been properly prepared, plaintiffs would not have owed taxes. Defendant admitted on cross-examination that a pension plan contribution cannot be made if a salary is not paid, and the IRS can disqualify such a pension deduction.

Brunetti, in reviewing a Pension Plan Expense Lead Sheet marked P-14 for identification at trial, testified that the IRS auditor, citing to case law, held firm to the opinion that transfers of property to a pension plan are prohibited.

11

Brunetti also described the transfer of real estate to the pension plan as prohibited.

The trial court never considered whether defendant deviated from the standard that required an accountant demand further information from a client. Instead, he placed liability on plaintiffs who failed to provide defendant with 1099 forms and provided defendant with information "[a]s to all the deductions that were disallowed," which defendant "utilized and relied upon." The court also failed to analyze that standard of care in connection with its analysis of "diverted income," concluding plaintiffs intentionally withheld eight 1099 forms from defendant.

We also determine the trial court erred in focusing on the cause of the IRS audit instead of whether defendant deviated from a standard of care by preparing a return devoid of any income to Riad that deducted contributions to a pension plan. The court also focused on whether the plan was "proper" but never addressed whether defendant should have shown income and requested more information from plaintiffs regarding the contribution, or both. Contrary to the court's finding that plaintiffs' experts merely hinted that the plan was improper, the experts clearly said the IRS prohibited the transfer of real estate to a plan

12

and that the IRS would disqualify deductions to a plan if no income was shown—a fact admitted by defendant.

We are unable to determine from the trial court's ruling if it did not believe Lama had a conversation with a Florida attorney who she said questioned the transfer of Florida real estate in 2008 to the plan or if it did not believe she conversed with defendant about the Florida attorney's concerns about the transfer. The court stated defendant's reply, after Lama allegedly told him "that a Florida attorney said he could not do what [defendant] wanted done," was to tell Lama "to tell the Florida attorney to do what he was supposed to do." From the context of the decision, it seems the court found defendant's reply as a finding of fact. Although he declared the Florida attorney's statement hearsay, it conflated the two alleged conversations—Lama with the Florida attorney and Lama with defendant—in its decision and expressed "[w]e do not know what [defendant] allegedly wanted the Florida attorney to do or the Florida attorney's ultimate response," before cryptically concluding "[a]ny reasonable evaluation of this version by Lama leads one to believe that this conversation never occurred." If the court did not believe the conversation with the Florida attorney took place, it still had to analyze defendant's knowledge as to the real estate transfer. The trial court's decision makes our review impossible.

13

We also discern that the trial court did not analyze what it determined to be plaintiffs' actions through the lens of our settled law regarding plaintiffs' contributory negligence in professional malpractice actions. Our Supreme Court observed:

> Actions involving a breach of professional duty are not everyday negligence claims—they involve obligations arising from special relationships. Five years ago, a unanimous Court in Conklin v. Hannock Weisman, 145 N.J. 395, 412, 678 A.2d 1060 (1996), observed that, "when the duty of the professional encompasses the protection of the client or patient from self-inflicted harm, the infliction of that harm is not to be regarded as contributory negligence on the part of the client." The view that comparative or contributory negligence generally may not be charged when a professional breaches his or her duty to a client reflects our heightened expectations of professional services in this State.
>
> [Aden v. Fortsh, 169 N.J. 64, 75 (2001).]

Thus, as to causation in professional negligence cases, "professionals may not diminish their liability under the Comparative Negligence Act[, N.J.S.A. 2A:15-5.1 to -5.8,] when the alleged negligence of the client relates to the task for which the professional was hired." Id. at 78. When, however, "a client impedes the professional in his or her performance by . . . withholding or failing to provide certain information to the professional concerning the matter for

A-2795-17T2

which the professional was hired[,] that [can] reduce[] a portion of the harm committed[.]" Id. at 77. So too,

> comparative negligence principles may be applied in professional malpractice claims in which the client's alleged negligence, although not necessarily the sole proximate cause of the harm, nevertheless contributed to or affected the professional's failure to perform according to the standard of care of the profession. Steiner Corp. v. Johnson & Higgins, 996 P.2d 531, 532 (Utah 2000). See also Scioto Mem. Hosp. Ass'n. v. Price Waterhouse, 74 Ohio St.3d 474, 659 N.E.2d 1268, 1274 (1996) (Cook, J. concurring) (noting that in accounting malpractice actions "comparative negligence may be applied only to negligent acts of a client that contribute to the accountant's failure to perform according to the standards of the accounting profession.")
>
> [Ibid.]

And if the client's—rather than the professional's—conduct was the sole, proximate cause of the damages, the trier of fact may find the professional is not liable. Ibid. While the trial court laid blame at plaintiffs' feet, it did not consider whether defendant breached the standard of care due them.

Because the trial court did not address pertinent issues, and did not comply with Rule 1:7-4(a), correlating its findings to relevant legal conclusions, we are compelled to reverse and remand this matter for a new trial before a different judge, after which findings of fact and conclusions of law addressing plaintiffs'

15

allegations of malpractice should be made in accordance with that Rule. In light of our holding, we need not address plaintiffs' contention that the motion judge erred in denying their post-trial motions.

Reversed and remanded for proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION