# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0604-24

T.I.B.,[1]

    Plaintiff-Respondent,

v.

P.M.P.,

    Defendant-Appellant.

_____

Argued October 7, 2025 – Decided October 24, 2025

Before Judges Firko and Perez Friscia.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Monmouth County, Docket No. FV-13-2223-24.

Greg S. Gargulinski argued the cause for appellant (Solop Bondarowicz & Gargulinski, attorneys; Greg S. Gargulinski, of counsel and on the briefs; Rebecca P. Rosenthal, on the briefs).

---

[1] We use initials to protect the confidentiality of the victim in these proceedings. <u>R.</u> 1:38-3(d)(10).

Emeka Nkwuo argued the cause for respondent (Lomurro Munson LLC, attorneys; Emeka Nkwuo, of counsel and on the brief).

PER CURIAM

Defendant P.M.P. appeals from the October 23, 2024 amended final restraining order (FRO) entered against him under the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. Defendant argues the trial judge erred in finding he committed the predicate act of harassment and that an FRO was necessary to ensure plaintiff T.I.B.'s future protection. As our review of the record demonstrates the trial judge's findings are supported by sufficient credible evidence, we affirm.

## I.

The parties had a dating relationship that began in the Fall of 2021. They met while working as dispatchers for the Monmouth County Sheriff's Office (MCSO). After about ten months of dating, plaintiff ended the parties' relationship in September 2022. During her relationship with defendant, she had also maintained a dating relationship with another man, N.C. Defendant did not want to terminate the parties' relationship. Plaintiff attempted a friendship with defendant but terminated it in October 2022. Thereafter, plaintiff told defendant not to contact her. Defendant contacted plaintiff by phone and text

messages between October 2022 and January 2023. In January 2023, plaintiff blocked his cell phone number from her phone.

On June 17, 2024, plaintiff obtained a temporary restraining order (TRO) after filing a domestic violence complaint. She alleged defendant committed the predicate act of harassment. One month later, plaintiff amended her TRO, incorporating the parties' prior history of alleged domestic violence and referencing the parties' 2023 cross-TRO trial.

In October 2023, the first judge presided over a three-day domestic violence trial regarding the parties' cross-TROs. At the conclusion of the trial, the first judge dismissed the cross-TROs. During the trial it was undisputed defendant had tried to call plaintiff "from private numbers," sent her text messages, and had sent gifts to her house after plaintiff ended their relationship, wanting no further contact. The first judge found plaintiff failed to prove a predicate act of harassment because there was no evidence defendant had "acted with the purpose to harass her." The first judge reasoned "the law must have some tolerance for a disappointed suitor trying to repair a romantic relationship, when his conduct is not violent or abusive or threatening but merely importuning."

3

After finding the evidence presented was "in equipoise," the first judge directed "if for any reason, there is communication [or] contact, [plaintiff] can come back. She can file for a new restraining order." The first judge also noted plaintiff had "now . . . made it abundantly clear that she does[ not] want to be friends, or exchange pleasantries . . . with" defendant and that "the circumstances may not be the same the next time." Regarding defendant's TRO, the first judge relayed it was "one of the most absurd TROs [she had] ever seen" and denied defendant's FRO application.

At the present FRO trial, defendant moved to bar plaintiff's testimony regarding any "prior history" because the first judge found plaintiff's previously alleged predicate acts were not "acts of domestic violence." Defendant argued plaintiff was "precluded under the principles of res judicata and collateral estoppel from relitigating the allegations which [had] been decided adversely to her in the earlier hearing." Regarding plaintiff's ability to introduce evidence of defendant's prior communications with N.C., defendant's counsel stipulated N.C. "did not testify at the last trial" and did not "disagree with [plaintiff's] [c]ounsel with regard to" N.C.'s testimony. The second trial judge found plaintiff may not "relitigate" the prior alleged acts of harassment and allowed "limited testimony" to "provide the context" for plaintiff's new predicate offense

A-0604-24

allegations. Defense counsel apparently stipulated to the second judge's limited review of the prior FRO hearing transcript.

Plaintiff testified in the present matter that during the parties' dating relationship, she was also dating N.C. In September 2022, plaintiff ended the relationship with defendant and shortly thereafter told defendant she wished to have no further contact. She blocked defendant's number on her phone, because he continued to try to communicate with her. Plaintiff continued dating N.C.

Between February and March 2024, plaintiff received three calls on her cell phone from the number 908-433-**31. Over the Memorial Day weekend, she received separate text messages from the number 906-415-**40 stating: "You messed up and one day you will realize"; and "You'll figure that out one day, hopefully sooner rather than later for your sake." After plaintiff read the messages at work, she had to take a break because she was upset. Plaintiff later learned the text messages came from a cell phone owned by a woman who volunteered with defendant at Keansburg Emergency Medical Services (EMS). Plaintiff acknowledged she had "no objective information . . . [defendant] ever asked [the woman] . . . to [contact her.]" After receiving the text messages, plaintiff learned a few hours later that N.C. also received a text message. The text message to N.C. came from the same cell phone number that had called her

in February and March 2024. Plaintiff only realized defendant had tried to call her after reviewing her cell phone for the number that sent N.C. the text message. Plaintiff reviewed her "secondary spam blocker" history and found the calls to her cell phone.

Plaintiff testified that she had blocked defendant in the past, but he had called her from blocked phone numbers. She felt "harassed by [the] phone calls and text messages" because defendant was not "respecting [her] wishes of no communication and not to contact [her]." After going "through a [prior] trial," plaintiff relayed defendant "continues . . . to escalate contact and find other means of contact, . . . even though . . . it's pretty well established at this point that [she] do[es] not want any form of any contact from him whatsoever." Plaintiff asserted defendant told her in the past that if she did not "talk to him and tell him what was going on, that [defendant] was going to reach out to N[.C.]"

After plaintiff briefly referenced defendant's voluminous earlier text messages presented at the prior trial, she conveyed she continually requested defendant to leave her alone from the time she ended the relationship. Plaintiff reiterated defendant had continued trying to communicate.

A-0604-24

N.C. testified that in August 2023 defendant contacted him through Instagram. In an initial Instagram message defendant had sent N.C., defendant stated, "I[ a]m [going to] end up ruining your life, and I do[ no]t want to." Defendant also messaged N.C. and requested that N.C. call him. During the 2023 telephone conversation, defendant revealed he was dating plaintiff. After N.C. inquired if defendant had any pictures, defendant forwarded photographs of plaintiff, including one of her scantily dressed. N.C. testified defendant acknowledged in a message that if plaintiff learned defendant contacted N.C., "she was going to apply a restraining order against him." Regarding the tone of defendant's messages, N.C. was concerned because defendant "kind of alluded to . . . [wanting] to cause some self-harm." N.C. messaged defendant stating, "If you don't stop talking like that, I'm going to get a[n ambulance] to pick you up." Defendant then "deflected from the conversation."

N.C. testified that in May 2024 he believed defendant again reached out by text from a cell phone number listed as 908-433-**31. The text message stated, "Pal, you messed up, your girl loves that kid P*** and you amount to nothing. You f[**]ked up treating her the wrong way [and] she will realize he's the better choice."

7

A-0604-24

During the trial, defendant testified that he works for the MCSO but in a different division than plaintiff. While he steadfastly maintained that he did not send any of plaintiff's alleged recent communications, defendant admitted "[t]he 908-433-[**]31" number was his "secondary phone number." Defendant explained that he kept two cell phones. He introduced a "Verizon[] security assistance team's" receipt of "a call detail explanation," showing there was no record he had called plaintiff's cell phone. He also acknowledged the woman with whom he volunteered at EMS owned the cell phone that originated the messages to plaintiff, but defendant testified he did not ask her to send the text messages and never told her about his relationship with plaintiff.

Regarding the 2023 Instagram messages to N.C., defendant conveyed he was "clearing the air and taking the weight off [his] shoulders" and the messages were not meant to harass. He further explained that he sent N.C. a photograph of plaintiff in her "underwear and bra" because N.C. had inquired whether defendant had pictures of plaintiff. Defendant maintained he did not intend to embarrass her.

During cross-examination, defendant acknowledged he received a 2022 text message from plaintiff stating, "Yes[,] it actually is threatening because [I a]m asking you to respect me and what [I] want and not talk to me[,] and you[

A-0604-24

a]re demanding I call you or else you[ a]re going to contact my boyfriend."  He also admitted to previously calling plaintiff from a "blocked" number and at different hours of the day, including 4:00 a.m.  Regarding the Verizon call log, he conceded it did not include whether text messages were sent.  While defendant acknowledged plaintiff produced a cell phone "screenshot" of calls from his second phone's number, he explained he did not make the calls and they were "possibly a spoof."  Although the text message to N.C. was from his secondary phone number and referenced defendant's name, he believed someone else used his number.

After hearing the testimony and reviewing the evidence, the second judge issued an FRO accompanied by an oral decision.  She found plaintiff proved by a preponderance of the evidence the predicate act of harassment.  The second judge explained she had observed the witnesses' "demeanor, . . . candor or evasion, willingness or reluctance to answer," and found "[d]efendant to be not credible."  She was also unpersuaded by defendant's explanation that he contacted N.C. in "good faith" and noted "[t]here was no reason for him to send pictures of [plaintiff] in her underwear."  The second judge found the first judge admonished defendant, "[d]on't contact her," and noted "yet, here we are."  After comparing "the verbiage" of the text messages, the second judge was convinced

9

they "us[ed] the same type of language." Emphasizing that she had "to weigh the credibility," the second judge found plaintiff proved by a preponderance of the evidence that defendant "did send those text messages."

The second judge also referenced the context of the parties' history, and found defendant "was warned" and the communication "continued." As to the relevance and admission of the prior alleged domestic violence incidents during the first trial, the second judge specifically noted she was "not looking at the previous history as establish[ing] domestic violence" but to show the continued communications were unwanted and "cross[ed] the line."

Regarding the determination of whether an FRO was necessary to protect plaintiff from immediate or future acts of domestic violence, the second judge found defendant "will continue to find a way to send these little digs at her." The second judge also determined defendant "would continue if I didn't enter a restraining order."

On appeal, defendant contends reversal is warranted because the second judge erred in finding: defendant committed acts of domestic violence that were supported by adequate, substantial, or credible evidence; he committed the predicate act of harassment; and that a final restraining order is necessary to protect plaintiff from further abuse.

10

II.

Our review of an FRO issued after a bench trial is limited. T.B. v. I.W., 479 N.J. Super. 404, 412 (App. Div. 2024). In reviewing "a trial court's order entered following trial in a domestic violence matter, we grant substantial deference to the trial court's findings of fact and the legal conclusions based upon those findings." J.D. v. A.M.W., 475 N.J. Super. 306, 312-13 (App. Div. 2023) (quoting N.T.B. v. D.D.B., 442 N.J. Super. 205, 215 (App. Div. 2015)). Trial court findings are "binding on appeal when supported by adequate, substantial, credible evidence." G.M. v. C.V., 453 N.J. Super. 1, 11 (App. Div. 2018) (quoting Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)). "We defer to the credibility determinations made by the trial court because the trial judge 'hears the case, sees and observes the witnesses, and hears them testify,' affording it 'a better perspective than a reviewing court in evaluating the veracity of a witness.'" Gnall v. Gnall, 222 N.J. 414, 428 (2015) (quoting Cesare, 154 N.J. at 412).

We do not disturb a trial judge's factual findings unless they are "so manifestly unsupported by or inconsistent with the competent, relevant[,] and reasonably credible evidence as to offend the interests of justice." S.D. v. M.J.R., 415 N.J. Super. 417, 429 (App. Div. 2010) (quoting Cesare, 154 N.J. at

11

412). "We accord substantial deference to Family Part judges, who routinely hear domestic violence cases and are 'specially trained to detect the difference between domestic violence and more ordinary differences that arise . . . .'" C.C. v. J.A.H., 463 N.J. Super. 419, 428 (App. Div. 2020) (quoting J.D. v. M.D.F., 207 N.J. 458, 482 (2011)). We, however, review de novo a trial judge's legal conclusions. Id. at 429.

The New Jersey Legislature enacted the PDVA "to assure the victims of domestic violence the maximum protection from abuse the law can provide." N.J.S.A. 2C:25-18. The PDVA defines a "[v]ictim of domestic violence" as "any person who has been subjected to domestic violence by a person with whom the victim has had a dating relationship." N.J.S.A. 2C:25-19(d); R.G. v. R.G., 449 N.J. Super. 208, 219-20 (App. Div. 2017) (recognizing the amended definition of "[v]ictim of domestic violence" evinced "the Legislature's intent to broaden the application" of the PDVA).

The entry of an FRO under the PDVA requires the trial judge to make certain findings pursuant to a two-step analysis delineated in Silver v. Silver, 387 N.J. Super. 112, 125-27 (App. Div. 2006). Initially, "the judge must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a)

12

has occurred." Id. at 125 (citing N.J.S.A. 2C:25-29(a)). The judge is also required to consider "any past history of abuse by a defendant as part of a plaintiff's individual circumstances and, in turn, factor that history into its reasonable person determination." Cesare, 154 N.J. at 403. "'A single act can constitute domestic violence for the purpose of the issuance of an FRO,' even without a history of domestic violence." C.C., 463 N.J. Super. at 434-35 (quoting McGowan v. O'Rourke, 391 N.J. Super. 502, 506 (App. Div. 2007)).

Second, if a predicate act is proven, the judge must determine whether a restraining order is necessary to protect the plaintiff from immediate harm or further acts of abuse. Silver, 387 N.J. Super. at 127. A previous history of domestic violence between the parties is one of six non-exhaustive factors a court is to consider in evaluating whether a restraining order is necessary to protect the plaintiff. N.J.S.A. 2C:25-29(a)(1); see also D.M.R. v. M.K.G., 467 N.J. Super. 308, 324-25 (App. Div. 2021) (holding whether a judge should issue a restraining order depends, in part, on the parties' history of domestic violence).

Harassment, N.J.S.A. 2C:33-4, is a predicate act of domestic violence enumerated under the PDVA. N.J.S.A. 2C:25-19(a)(13). Under N.J.S.A. 2C:33-4(a), a person commits harassment "if, with purpose to harass another, he [or she] . . . [m]akes, or causes to be made, one or more communications

13

anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm."

To commit harassment, a defendant must "act with the purpose of harassing the victim." D.M.R., 467 N.J. Super. at 323. "'A finding of . . . purpose to harass may be inferred from the evidence presented' and from common sense and experience." Ibid. (quoting H.E.S. v. J.C.S., 175 N.J. 309, 327 (2003)). "Although a purpose to harass can be inferred from a history between the parties, . . . that finding must be supported by some evidence that the actor's conscious object was to alarm or annoy; mere awareness that someone might be alarmed or annoyed is insufficient." J.D., 207 N.J. at 487. A judge must consider "the totality of the circumstances to determine whether the harassment statute has been violated." H.E.S., 175 N.J. at 326 (quoting Cesare, 154 N.J. at 404).

### III.

We first address defendant's contentions that the second judge improperly found defendant committed the predicate act of harassment by relying: on credibility determinations "rather than the substance of the evidence and the testimony presented"; and "solely" based "on the parties' prior history." A review of the second judge's nineteen-page oral decision demonstrates these

A-0604-24

arguments are without merit as sufficient evidence supports the finding that defendant's communications constitute harassment.

After considering the testimony and admitted evidence, the second judge found plaintiff was credible and defendant's explanation regarding the communications lacked credibility. The second judge found plaintiff established that defendant committed harassment by a preponderance of the evidence because he sent her and N.C. unwanted text message communications with no legitimate purpose. In finding defendant sent the messages with the purpose to harass plaintiff, the second judge highlighted that defendant knew plaintiff wanted no further contact from him and felt harassed by his earlier communications. The second judge explained in finding harassment that "it's not necessarily the content of the communications" but that "he's still communicating" with her "after being warned if he did," a future FRO could be entered against him.

Based on the evidence presented at trial, the second judge specifically reasoned that defendant committed harassment because: defendant knew not "to communicate" with plaintiff but "he did"; defendant "continued to" communicate "after being warned" not to "contact her"; the three text message "communications came from" defendant, with one sent from a colleague

15

volunteer's cell phone even though the woman was not told "about his relationship"; and defendant "relentless[ly] refus[ed] to leave her alone," causing plaintiff "stress." The second judge also found defendant's explanation for having two phones and switching his phone number did not "make sense."

While the second judge did not explicitly cite subsection (a) of N.J.S.A. 2C:33-4,[2] her findings of fact correlate to each of the subsection's elements. After the second judge referenced the prior FRO trial transcript, she noted the first judge had determined plaintiff failed to prove defendant's earlier communications were more than defendant "trying to win her back" and sent with the requisite purpose to harass. Specifically, in line with the first two elements of subsection (a), the second judge explained that in the present case defendant acted purposely in sending the "communications," because "I have to

---

[2] On appeal, defendant argues the second judge failed to make any findings of fact or conclusions of law but does not specifically raise that the second judge failed to cite the applicable harassment subsection. "A trial judge must state clearly the factual findings and correlate them with relevant legal conclusions . . . so that parties and the appellate courts may be informed of the rationale underlying the conclusion." Monte v. Monte, 212 N.J. Super. 557, 565 (App. Div. 1986). We are satisfied the second judge has fulfilled this obligation. Cf. State v. Pillot, 115 N.J. 558, 566 (1989) (upholding a court's sentence because it was "possible in the context of this record to extrapolate without great difficulty the court's reasoning"). While the second judge's opinion provides findings that track the elements of N.J.S.A. 2C:33-4(a), we note the better course would have been to reference the exact subsection relied on.

A-0604-24

look at it in terms of the fact that . . . the communications, unwanted communications, that at that point didn't rise -- cross the line, but the continuation of it does."  She emphasized that there was "no reason for them to communicate" and defendant continued to send multiple text messages.

Consistent with subsection (a) of N.J.S.A. 2C:33-4, which also requires a finding that defendant's communications were "likely to [cause] . . . alarm," the second judge credited plaintiff's testimony that receiving defendant's text messages was "shock[ing]" after the parties' history and that she was "panicking."  The record amply supports the second judge's <u>Silver</u> prong one finding that defendant committed the predicate act of harassment by purposely sending multiple communications in a manner that caused plaintiff to be alarmed.

We next address defendant's contention that the second judge erred in considering the parties' history.  Our Supreme Court has held that "not only may one sufficiently egregious action constitute domestic violence under the [PDVA], even with no history of abuse between the parties, but a court may also determine that an ambiguous incident qualifies as prohibited conduct, based on a finding of violence in the parties' past."  <u>Cesare</u>, 154 N.J. at 402.  Further, the Court in <u>State v. Hoffman</u> elucidated that when a trial judge is "determining

17

whether a defendant's conduct is likely to cause the required annoyance or alarm to the victim, that defendant's past conduct toward the victim and the relationship's history must be taken into account. The incidents . . . must be examined in light of the totality of the circumstances." 149 N.J. 564, 585 (1997). We have also recognized that "[d]omestic violence is ordinarily more than an isolated[,] aberrant[,] non-violent act." Kamen v. Egan, 322 N.J. Super. 222, 227-28 (App. Div. 1999).

Defendant's argument that the second judge found the predicate act of harassment based solely on the parties' prior history and defendant's prior communications, which the first judge found were not harassment, is unsupported by the record. The second judge found the predicate act of harassment based in the new allegations and considered for context the parties' "prior history." The second judge correctly considered the prior history for the "limited purpose" of showing that defendant knew "that any further communication . . . would [be] consider[ed] to be harassing" and "to provide context as to why she feels harassed by these new communications."

Additionally, the second judge made clear she was not "going to relitigate . . . those underlying acts" in the present FRO and appropriately narrowed consideration of the parties' history to providing context. We note that

after the second judge ruled on the defendant's motion to bar, defendant's counsel "conditionally stipulated" to the admission of the evidence "for that limited purpose." Also, defendant admitted knowing plaintiff wanted no further contact and he did not deny it was clear she would deem any further communications harassing. For these reasons, we find no error in the second judge's consideration of the parties' prior history for context in determining whether plaintiff proved defendant committed the newly alleged predicate act of harassment.

We also reject defendant's reliance on J.F. v. B.K. to support his contention that "the principles of res judicata and collateral estoppel" barred the second judge from considering the parties' prior history. 308 N.J. Super. 387 (App. Div. 1998). Defendant misconstrues our holding in J.F. as preventing an FRO trial court from ever considering a defendant's alleged prior acts, which are contained in a new TRO's prior history section, if an earlier court has found the acts were not domestic violence. In J.F., we determined the trial court violated res judicata because it found the defendant committed harassment based on the plaintiff's previously alleged "prior acts" that an earlier court determined were not domestic violence after a trial. 308 N.J. Super. at 392. Notably, the trial "court's opinion" in J.F. "did not mention the [defendant's acts] which had been

the subject of [the plaintiff's] complaint." Id. at 391. We recognized in J.F. that the plaintiff could have presented evidence of surrounding circumstances to support "a finding that . . . ordinarily innocuous conduct constituted an act of harassment." Ibid. Here, the second judge did not violate res judicata because she found plaintiff proved defendant committed a new predicate act and rightfully considered the parties' prior history to provide context for the allegations and to analyze the second Silver prong.

Defendant's contention that the second judge shifted the burden of proof to him is also without merit. The record is bereft of any statement that defendant had "to prove that [the communications] did not occur." To the contrary, the record demonstrates the second judge rightly placed the burden on plaintiff.

Regarding Silver prong two, we discern no error in the second judge's finding that plaintiff requires an FRO for her future protection. The second judge found plaintiff "does not want to be contacted by" defendant and his communications cause her distress. Plaintiff testified to needing an FRO because it had "been years . . . [of] dealing with this" and defendant continued to contact her. She explained the stress defendant's recent messages caused and that when defendant had shared revealing pictures of her that she "felt upset" and "scared." After the second judge found harassment based on defendant's

new communications and considered the context of the acts, she found it was in plaintiff's "best interest" to protect her "from any further communication with [defendant]." We discern no basis to disturb the second judge's <u>Silver</u> prong two findings, which are sufficiently supported by the substantial credible evidence in the record.

To the extent not addressed, defendant's remaining contentions lack sufficient merit to warrant discussion in our written opinion. <u>R.</u> 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

21