**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2822-16T4T2

STEVEN MCBOYLE,

       Plaintiff-Respondent/
Cross-Appellant,

v.

DEANNA MCBOYLE,

       Defendant-Appellant/
Cross-Respondent.

---

Argued March 13, 2019 – Decided May 13, 2020

Before Judges Fuentes and Vernoia.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FM-07-0773-14.

Jennifer Lazor argued the cause for appellant/cross respondent (Lazor Rantos PC, attorneys; Jennifer Lazor, of counsel and on the briefs).

Mark H. Sobel argued the cause for respondent/cross appellant (Greenbaum Rowe Smith & Davis, LLP, attorneys; Mark H. Sobel, of counsel and on the briefs; Lisa B. DiPasqua, on the briefs).

The opinion of the court was delivered by

FUENTES, P.J.A.D.

Plaintiff Steven McBoyle and Defendant Deanna McBoyle appeal from a final Judgment of Divorce (JOD) entered by the Chancery Division, Family Part on November 16, 2016. The parties were married for nearly thirteen years and have three children. The proceedings that led to the issuance of the JOD were highly contentious. The Chancery Division, Family Part judge who tried this case heard testimony from witnesses, reviewed documentary evidence, and considered the arguments of counsel over twenty-two nonconsecutive days.

The parties are licensed accountants, although defendant voluntarily let her license lapse. Plaintiff works in finance and chose to be the primary income producer during the marriage. Defendant worked as an accountant and real estate broker early in the marriage. The parties had three children. Defendant opted to stop working outside the home to devote her time to the care of the children and the administration of the household. The final JOD identified the marital assets, ordered the equitable distribution of these assets, and determined spousal and child support. The judge ordered plaintiff to pay defendant $200,000 per year as durational alimony for seven years, $496 per week in child

2

support, and $180,000 retroactive pendente lite support owed to defendant, which represented a savings component.

Defendant appeals from the court's rejection of two alleged incidents of dissipation of marital assets by plaintiff, the amount of the alimony and child support awards, the pendente lite support, and the denial of her application for an award of counsel fees. In the event we decide to remand any aspect of the case, defendant argues the matter should be assigned to a different judge. Plaintiff filed a cross-appeal in which he argues the trial judge erred by awarding defendant a retroactive savings component through the pendente lite support and by failing to credit him for defendant's pendente lite expenditures that exceeded their marital standard.

After reviewing the record developed before the Family Part and mindful of prevailing legal standards, we reject the parties' arguments and affirm.

I

A

Pre-Marital Background

The parties met in the late 1980s while studying accounting at the University of Waterloo in Canada. They lived together sporadically during their time as students. After graduation, they both passed the Canadian licensing

examination for accountants. Defendant secured a position with Price Waterhouse while plaintiff worked for Deloitte and Touche, both entities were located in Toronto. They lived together until 1994 when plaintiff decided to take a job in Connecticut and defendant transferred to the Boston office of Price Waterhouse. They both passed the required examination and became certified public accountants in the United States.

In January 1996, plaintiff enrolled in Columbia Business School and resided in the student dormitory; defendant remained in Boston working for Price Waterhouse. Plaintiff claimed he paid the tuition and related living expenses with money he borrowed from his parents. He produced a signed a handwritten agreement dated August 29, 1996, which stated:

> Steven McBoyle hereby promises to repay his parents, Geoffrey and Edith McBoyle, the sum of C$63,000 (U.S. $45,400) being the sum provided for Columbia University fees in a Canada Trust line of credit at 5.5% p.a.
>
> In addition, he promises to repay the sum of U.S. [$]25,290 incurred in moving to 900 Newport Parkway, Apr. 904, in November 1995 and subsequent requests.
>
> He also agrees to repay his parents, Geoffrey and Edith McBoyle, whatever loan is required from them as needed for costs in accommodation, food, clothing, and sundries while at Columbia University at a rate of 4.5% p.a.

4

> All loans are to be repaid in as timely a period as possible, recognizing that Steve will not be earning a salary until at least 1998.

Defendant testified she did not "recollect" how plaintiff paid for his education at Columbia.

The parties' romantic relationship wavered through the 1990's but ultimately prevailed when they married on October 21, 2000. Plaintiff held a variety of banking and wealth management positions. Defendant secured a position in Price Waterhouse that allowed leave to relocate and thereby follow plaintiff throughout his professional odyssey.

The parties relocated to Jersey City in June 2001, when plaintiff accepted a position as a wealth manager and defendant again transferred within Price Waterhouse. They also purchased a home at Byron Road in Short Hills for approximately $770,000, using joint savings to fund the down payment. During her eleven years with Price Waterhouse, which later became a part of IBM, defendant's highest annual salary was $122,000. She also averaged $75,000 per year during her consulting career.

The parties' first child (a boy) was born in December 2001, and the couple's second child (a girl) was born in May 2004. Defendant resigned from IBM at the start of 2004, obtained a real estate license, and began to work as a

realtor. This type of work provided her the flexible schedule she needed to accommodate to care for the parties' children. Her annual salary was approximately $90,000 at the time of she resigned from IBM; she earned $63,000 in 2006 as a realtor, her most profitable year in this field. When defendant was employed as a realtor, the parties hired nannies to care for the children five days per week, from 7:00 a.m. until 7:00 p.m. Defendant continued to work as a realtor until 2006, when she decided to devote all her time to the children and other domestic responsibilities. Her CPA license lapsed after she left the field.

Around 2006, the parties purchased the marital residence for $729,000; the house is located on Forest Drive in Short Hills. Their initial intent was to acquire the property as an investment. Defendant's parents moved in with them to assist with renovations, which cost approximately $600,000 and involved the services of a prominent architect. When the renovations were completed, the parties decided to keep the house as the family residence. They sold the Byron Road property for $1,400,000.

In 2007, plaintiff accepted a position with Royce Funds, Inc. (Royce) in New York City. He held the same position when this matrimonial action came before the Family Part. His base salary is $400,000 and is supplemented by

discretionary quarterly bonuses. The parties had their third child (a boy) in November 2008.

In 2009, plaintiff began paying back the money he borrowed from his parents to attend Columbia Business School. He testified he paid them "[a]proximately $20,000" in 2010; $29,350 in 2011; and $172,550 in 2012. Several of the checks that corresponded to these amounts listed "MBA" or "MBA payment" in the memo line. Defendant acknowledged these payments totaled "almost $300,000"; plaintiff concurred with this amount. Plaintiff explained that he began repaying his parents at that time because he was finally "comfortable enough" to do so. When defendant asked plaintiff about this, he told her they were payments for a "loan for Columbia Business School." Defendant testified she was previously unaware of this loan from plaintiff's parents:

> Throughout the entirety of our relationship and marriage I was never informed of a loan. It was never discussed. The net worth statements that Steven so diligently every weekend as he testified spent time doing, the balance or the net worth statements was defined as assets and liabilities. This would have been a significant liability that would have been – represented on the net worth statement. It was never on there. It was never discussed. It didn't exist as far as I knew.

> In addition to that there were years before the first payment that was made on this list where there was significant amounts of money that could have been used to repay this loan. We paid off mortgages before this loan was paid off. We had hundreds of thousands of dollars sitting in CD's before this loan was paid off or this supposed loan, please let me go on the record to say. We paid off cars before the very first payment of this was ever done. Steven was extremely averse to any kind of debt. He didn't want any debt or liability and was proud to tell anybody that we had no debt and no liabilities. So this was complete news to me when I discovered from him in 2014 about a loan.

Defendant prepared and filed the family's income tax returns for many years. The returns for tax-years 2011, 2012, and 2013 were not timely filed. As a consequence, the family incurred significant penalties and interest that amounted to approximately $26,000.

In January 2012, plaintiff invested $100,000 with Family Security Holdings, LLC (Family Security) through a family friend, Gary[1] Winterbottom. By 2013, the investment was not successful, and Winterbottom arranged to recover $74,000 of plaintiff's initial investment from Family Security's successor company Gray Insurance Company. In an email dated October 17, 2013, Winterbottom asked plaintiff: "Can you please let me know what mailing

---

[1] The appellate record also refers to Gary Winterbottom as Kemo or Kimo Winterbottom.

address you want me to use for the $74,000 check about to come to you from Gray?" Plaintiff replied: "Royce and Associates, Attn: Steven McBoyle, Portfolio Manager . . . New York, NY[.]"

The record does not definitively establish that plaintiff received this check. The record also does not show a loss on the family's tax return relating to this investment. Long after the commencement of the trial, defendant's counsel issued a subpoena to the investment company for a copy of this check. The court quashed the subpoena as untimely. In his testimony, plaintiff did not explain the final outcome of this investment.

Plaintiff testified that in 2012, he decided not to hire a professional landscaping company to reduce the maintenance cost and directed his oldest son to mow the lawn "to teach him the purpose of hard work." Plaintiff also used the YMCA fitness facilities instead of joining a health club. Around this time, the oldest son began to attend the Pingry School (Pingry), a private day school with tuition of approximately $40,000 annually.

As marital difficulties escalated, plaintiff decided to rent a one bedroom apartment in New York City in October 2012. He continued to see the children by visiting the family home in Short Hills. This living arrangement cost plaintiff approximately $34,000 from October 2012 until he filed the complaint for

divorce on October 4, 2013. Plaintiff admitted that he used money, which would have otherwise been deposited into savings, to pay for these additional separate living expenses. Around this same time, defendant used marital funds to lend her parents approximately $60,000; she also lent her brother $12,000 in August 2013. Plaintiff testified he was not aware of or consulted about these loans.

B

Marital Lifestyle

Other than the marital residence, the parties' assets consisted primarily of cash kept in bank accounts, stocks, and retirement accounts. They also made individual investments with Sequoia Funds, Royce, and Berkshire Hathaway. As of November 15, 2015, the marital assets totaled $3,184,000, exclusive of the marital residence and plaintiff's post-complaint income. Plaintiff's gross income for 2011, 2012, 2013, and 2014 was $1,256,145; $1,200,814; $854,542; and $1,418,530.44, respectively.

Plaintiff testified that during the marriage they saved on a monthly basis by automatically transferring part of his salary into a savings account at Fidelity. "The amount was $5000 per month and was again, preauthorized withdrawal, very regularly, consistently for a long time." At times, they deposited $6000 per

10

month. According to plaintiff, whatever money was not spent was saved. Defendant estimated the family saved a total of $39,000 per month or $468,000 per year. They also opened separate savings accounts for the children and for defendant's brother's children.

The parties' professional background governed how they monitored their personal financial activities. They prepared and maintained spreadsheets to document the family's expenditures and assets. Plaintiff updated these documents every Sunday morning; defendant also had access to the spreadsheets and updated them periodically. The family budget spreadsheets, which both parties considered very important and spent a great deal of time compiling, showed both proposed spending and actual spending. The spreadsheets showed the family's monthly expenses totaled $8438 in 2010, $11,600 in 2011, and $10,300 in 2012.

Plaintiff estimated that private college tuition and board for all three children would cost $880,000. His goal was to save that amount because "[e]ducation was a very, very high priority"; he wanted to "ensure that [the parties] had enough finances to provide college, and post-secondary education" for all three children. Despite the parties' fastidious nature and professional proclivity for meticulous financial record-keeping, defendant claimed she was

unfamiliar with plaintiff's savings goals to cover the cost of the children's college education.

C

Marital Dissolution and Pendete Lite Support

In October 2013, plaintiff filed the complaint to dissolve the marriage and to equitably distribute the marital assets. He acknowledged that all assets acquired during the marriage should be distributed equally, except for the $880,000 set aside to fund the children's college education. As part of the equitable distribution of marital assets, plaintiff sought to compel defendant to purchase his 50% interest in the marital residence. With respect to their personal cars, plaintiff proposed he retain his Honda, worth $20,000, and defendant retain her Infiniti, worth $30,000. To avoid a windfall to defendant based on the disparity of the cars' values, plaintiff proposed he receive an equalizing cash payment. Finally, in the distribution of household furnishings, plaintiff asked to retain certain items[2] that had "sentimental" value to him and allowed defendant to keep the remainder, with proper equalization of value compensation.

---

[2] Plaintiff unilaterally removed certain personal items from the marital residence and kept them in his New York apartment. Among these items were two urns from his trip to Italy and gold and silver coins.

12

Defendant filed an answer and counterclaim for divorce. She sought equitable distribution, $350,000 per year of durational alimony for thirteen years, $60,000 per year in child support, and a judicial decree requiring plaintiff to obtain a $2,000,000 life insurance policy as security for these obligations. Independent of these issues, defendant sought to compel plaintiff to pay the tuition for Pingry and create a fund to cover the cost of the children's college tuition.

Plaintiff voluntarily paid pendente lite support to defendant in the amount of $5200 per month in the form of biweekly $2600 installments and deposited $121,000 in a joint marital account. Defendant considered the $121,000 deposit as additional pendente lite support. Plaintiff testified he erroneously deposited the $121,000 into the account. He thus withdrew the same amount from a different account to rectify the error.

Plaintiff received quarterly performance bonuses throughout his career at Royce. However, he did not receive a bonus during the pendente lite period for the fourth quarter of 2013. Instead, he received a one-time "retention bonus" of approximately $500,000 in mid-2014 as part of the firm's plan to discourage valued employees from leaving. Plaintiff testified that the firm was hiring younger employees and he was "aging out" of his position. Defendant disputed

plaintiff's characterization of the $500,000 payment. She claimed this professed retention payment was actually "a retroactive payment of a bonus that was to have occurred in December 2013, and a bonus in March of 2014." She argued she was entitled to recover one-half of the prorated amount of the bonus for the three days in October 2013 prior to the filing of the complaint.

On April 28, 2014, defendant prepared a spreadsheet of their finances and determined the family's annual spending was $172,730 or $14,394 per month. This showed the family's expenditures were significantly higher than the previous years' spending, as set forth on the joint spreadsheets. Defendant calculated the children's annual expenses were $24,740. When compared with the joint spreadsheet total of $13,265, the expenses were grossly underestimated.

Defendant's initial case information statement (CIS) from July 2014, estimated the family's monthly expenditures at $36,110; this included savings or investments of $19,500 per month. Plaintiff filed a CIS on August 25, 2014 that listed total spending for the joint lifestyle of the family at $12,223 per month. Plaintiff's family budget provided $2957 for shelter, $715 for transportation, and $8551 for personal expenses, which included the monthly tuition at Pingry and $1000 monthly membership fee to the Short Hills Country Club. Plaintiff's spending projections, excluding defendant and the children,

totaled $8597. Plaintiff filed an amended CIS on March 16, 2015 that listed total spending for the joint lifestyle prior to the divorce at $11,979 per month. He listed his lifestyle costs of $15,975 per month because of the $5200 per month in support paid to defendant.

On February 12, 2015, the court ordered defendant to provide proof she was actively seeking to secure employment since the filing of the divorce complaint. Defendant did not comply with the court's order. On March 9, 2015, court-appointed appraiser Christopher Healy appraised the marital residence at $1,585,000. Louis Sorce, an appraiser hired by defendant, valued the property at $1,325,000.

On March 19, 2015, defendant filed an updated CIS, which the court admitted into evidence. Defendant listed total monthly expenses for the family before the divorce as $64,730; this consisted of $6656 in shelter, $1503 in transportation, and $56,571 in personal expenses, which included $3333 for the monthly tuition at Pingry and $39,000 in monthly or $468,000 in annual savings. Defendant sought additional support for her own independent spending, which included the three children. In this category, defendant listed $37,117 in expenses per month consisting of $3731 for shelter, $947 for transportation, and $32,439 for personal expenses, which included $3333 in Pingry costs and

15

$19,500 in monthly savings. Defendant acknowledged she spent $358,538 (or $16,297 per month) during the twenty-two months pending the formal commencement of the divorce action. In May 2015, defendant changed the family's computer password. Plaintiff did not have access to the family's financial spreadsheets from this point forward.

In the summer of 2015, defendant took the children on a two-week "celebratory" European cruise vacation to Rome, Nice, Madrid, Barcelona, Florence, Pompeii, and Milan. The services provided during this excursion included a private butler and cost approximately $10,000 per week. Both parties admitted this trip was not the type of family vacation they took during the marriage. Defendant also traveled on vacation that summer to Jackson Hole, Wyoming, and Antigua. She testified she took these extravagant trips because the family had not taken their usual vacations, which involved destinations such as Florida, South Carolina, Michigan, and the Caribbean.

Plaintiff left the marital residence sometime between April and May 2015. His updated CIS filed on August 7, 2015 listed total family expenses at $11,969 per month; this included $2992 in shelter, $871 in transportation, and $8106 in personal expenses. His independent spending increased to $16,488; this included $6342 in shelter, $681 in transportation, and $9465 in personal

16

expenses, including $5200 per month paid to defendant and $1500 for Pingry tuition.

Plaintiff claimed defendant exaggerated the family expenses. He calculated each child's annual college tuition cost and estimated it would cost a total of $880,000 for all three children to attend private college. He wanted to provide financial support "to replicate entirely the life" defendant and the children had before the divorce.

Defendant testified consistent with the financial information she disclosed in her CIS. She was approximately forty-five years old at the time this case came for trial. She provided the following testimony when asked about her post-divorce employment prospects:

> Q. Do you have an idea about what you would like to do professionally post[-]divorce?
>
> A. I don't have that figured out at this point in time. I hope to find something that I find professionally satisfying. At this point in time I have spent the last two years going through this very grueling process.
>
> Q. Meaning this divorce?
>
> A. Meaning this divorce . . .
>
> . . . .
>
> Q. Why are you having such a difficulty deciding what it is you want to do?

A. I've had very little time to focus on myself and what it is I'd like to do. My family and . . . our lives was my profession for the last seven years, eight years. While [plaintiff] furthered his career. And that took up all of my time. In addition to that [plaintiff is] very fortunate to have always had a very clear vision of what he wanted to do and I supported him in that vision. Moved around. Supported his jobs. I wasn't so fortunate to have that clear vision. I did several things that were satisfying at the time. But, not conducive to family life. And family and home has always been a priority and always been important to me. And important to us. And right now I have three kids twenty four seven. And I am executing several full time jobs on very little sleep. Finding a job which can also be a full time job is not something that I have time for at this point in time, but I hope to.

When asked about her earning capacity, she provided the following response:

Without knowing exactly what the job is going to be I could only answer that based on the two jobs that I have – I've done so far to date. And real estate proved to show that it's somewhere in the $40,000 range and fifteen years ago what I was doing I'm not qualified to do at this point in time. I don't know what would be involved in – in – in getting up to speed if I would even be able to – to – to continue to even try to do something like that. Although, it's not something that is conducive. I can't be traveling as a single mother with three children. So, other than real estate at this point in time that's probably the best estimate that I have.

On cross-examination, plaintiff's counsel asked defendant if she believed she had an obligation "to support the family financially." Her immediate

18

response was: "I'm thinking." At this point, defense counsel objected to the question. It took approximately thirty seconds for the trial court to address and resolve the ensuing comments and arguments from the attorneys. When the focus returned to defendant, plaintiff's counsel asked defendant to "tell the [c]ourt what activities you have done to determine how you can resurrect your CPA license." Defendant responded: "I have not established that that is necessary. So I have not gone through the steps." The transcript of this portion of defendant's cross-examination reflects a constant and deliberate attempt by defendant to evade answering the questions asked of her, not only by plaintiff's counsel, but by the trial judge as well. After repeated attempts to obtain a responsive answer from defendant proved to be futile, the judge addressed defense counsel directly as follows:

> THE COURT: Counsel, I'm going to take a five minute recess. I want you to speak with your client with regard to answering questions. I asked a yes or no question, I expect a yes or no answer. I don't expect an editorialize. This is really very frustrating. Quite frankly she needs to answer the questions that are asked of her.
>
> DEFENSE COUNSEL: I will do that Your Honor. I will also note that knowing Ms. McBoyle as I do, she's trying very hard to answer questions truthfully and comprehensively.

19

THE COURT: Yes or no, does not mean that she is then going to try to explain, not for me, not for you and not for [plaintiff's counsel].

DEFENSE COUNSEL: I will give her instruction Your Honor.

Finally, defendant acknowledged on cross-examination that she had not considered reactivating her CPA license nor made any effort to seek employment outside the home since 2007. She also did not provide any information to the court regarding possible employment. She claimed that $5200 monthly pendente lite support was insufficient to meet the family's needs. She had therefore used a variety of cash savings accounts to augment the support. She spent $120,000 held in a certificate of deposit to supplement the pendente lite support between February and August 2015 and spent an additional $46,000 from another account for the months of September 2013 and August 2015. She candidly admitted that she used these "significant" marital assets because "[t]he amount of pendente lite support that's been received, as I've repeatedly said has been very inadequate." Defendant estimated she would need $19,500 per month in savings because she "received inadequate support for regular expenses" and "[t]here have been zero savings" during the pendente lite period.

According to defendant, her total monthly spending needs, exclusive of savings as shown on her first CIS, were $16,610, or $13,277 excluding the Pingry tuition. In her second amended CIS, she listed $37,117 per month for spending needs, to include $19,500 per month in savings. Exclusive of savings and the Pingry tuition, this amount would be $14,284. The amended CIS reflected an increase from her prior filing, which had a total budget of $36,110. She estimated family vacations to be amortized at $2833 per month during the marriage and $1750 per month after the marriage because of plaintiff's absence; these costs included two "girls' weekends" for her annually, along with annual family trips to Vermont or upstate New York, Florida, Kiawah Island, and the Caribbean.

The judge next focused on plaintiff's payment of the loan he obtained from his parents before the marriage. Defendant testified that she first discovered these payments in early 2014, when she found a check register sitting on the desk in the family's home. She explained

> I got many different stories on this. I was told that there were 40 payments of $2500. I was told that there was approximately $100,000 paid. I was told I was crazy, that there was no way near that amount paid. I got many different stories. Every time he spoke about it, it was a different story.

21

A-2822-16T4

Defendant also claimed she was not aware of the 2012 Winterbottom investment until early 2014. She claimed plaintiff described the investment to be a total loss but did not provide any documentation to support the loss. Winterbottom testified on defendant's behalf. He and his wife had been personal friends of the parties for about ten years. They frequently invited the parties to their homes in Windham and Bay Head. Winterbottom acknowledged that since the divorce, he and his wife have maintained frequent contact with defendant. They have not maintained a similar relationship with plaintiff.

According to Winterbottom, in January 2012, plaintiff invested $100,000 with Family Security, a company in which he was executive chairman. Winterbottom made clear that he did not have any conversations with defendant about this investment in 2012 or 2013. When he left the company in October 2013, he "negotiated . . . for himself and five other investors who were early investors in the company. The terms of the exit were consideration of seventy four cents on the dollar, of the original investment." Plaintiff "did receive" a payment of $74,000 from his original $100,000 investment. He and plaintiff exchanged emails regarding where to send the $74,000 check, but Winterbottom "did not see any document" confirming that plaintiff had received the money.

D

A-2822-16T4

## Trial Court's Decision

The trial judge issued an eight-page JOD supported by a sixty-nine-page letter opinion in which she discussed and addressed all of the issues raised by the parties.  With respect to equitable distribution, the trial judge largely divided the marital assets equally and awarded the post-marital assets, including certain bank accounts, to the respective parties.  The judge found defendant was "not entitled to a credit for the [Columbia] loan that was repaid to the plaintiff's parents" and rejected plaintiff's application for a $60,000 credit for money loaned or paid to defendant's parents.  The judge awarded plaintiff one half of the $12,000 loan the parties made to defendant's brother during the marriage.  As to the Winterbottom investment, the judge denied defendant's application for a $50,000 credit but found she would "be entitled to a one-half credit of any funds that Steven receives in the future from this investment."

The judge awarded defendant a pro-rata portion of plaintiff's $500,000 bonus during the four-day earning period in the quarter from October 1, 2013 until October 4, 2013, which was the date plaintiff filed the complaint for divorce.  Plaintiff received a $5000 credit to account for the difference in value between the Honda he retained and defendant's Infiniti.  The judge denied

plaintiff's application for a $26,000 credit arising from the fines assessed by the Internal Revenue Service due to defendant's late filing of the family's tax returns.

The judge characterized the family's lifestyle as "modest upper class" to "upper-class." With respect to spousal support, the judge ordered plaintiff to pay defendant durational alimony of $200,000 per year for seven years. The judge also awarded defendant a credit of $180,000 from plaintiff's share of the marital assets, representing $5000 per month in savings that was not met during the three-year pendente lite period. The judge imputed $63,000 per year income to defendant based primarily on her previous experience as a realtor. The judge found defendant "intentionally" remained unemployed throughout these proceedings. The judge noted defendant earned "a minimum" of $63,000 per year as a realtor, "in excess of $100,000" during the time she was employed as an accountant, and "vehemently opposed the idea that she may have to obtain employment outside the home."

With respect to support for the children, the judge ordered plaintiff to pay $496 per week based on the Child Support Guidelines and a percentage of other expenses. As part of the child support obligation, the judge ordered plaintiff to pay a share of unreimbursed medical and dental expenses for the children; plaintiff is responsible to pay 73% and defendant is responsible to pay 27%;

defendant must pay the first $250 annually. Plaintiff is responsible to pay a share of the costs of extra-curricular activities, lessons, and camp for the children. The judge ordered plaintiff to pay 73% and defendant paying 27%. The parties are also responsible to pay the cost of the Pingry tuition commensurate to their income levels; plaintiff must pay 73% of the tuition and defendant 27%.

The judge ordered the parties to establish an $80,000 college fund for each of the three children, for a total of $240,000. Expenses incurred beyond the limit of this fund were to be shared by the parties "based upon their incomes and assets and pursuant to the prevailing case law at that time after all scholarships, grants and student loans have been taken by the child." The judge ordered both parties to share the cost of day care, "pursuant to their share of the income," in the event defendant returned to employment outside home.

The judge awarded the parties joint legal custody of the unemancipated children and parenting time in accordance with the terms of the custody and parenting time agreement. The court ordered that the parties take income tax exemptions for the children in a manner that would allow each parent to claim two of the children in alternate years and one child per year otherwise. The judge denied the parties' reciprocal applications for an award of counsel fees.

On February 14, 2017, the judge issued an order to clarify and amend the JOD. These amendments are listed and described in thirty individually numbered paragraphs. They address mostly ministerial corrections, minor changes to account balances, and other similar de minimis modifications. The court ordered equitable distribution of certain additional omitted assets, including tax refunds and bank accounts. On July 10, 2017, the court issued a final order regarding the pendente lite credits owed to defendant for certain education expenses, unreimbursed medical and dental expenses, real estate taxes, homeowners insurance, and auto insurance. These pendente lite costs were paid from marital accounts. The court awarded defendant $53,268.84.

## II

We start our review of the Family Part's comprehensive decision by addressing defendant's claim that the trial judge erred in equitably distributing the marital assets. In support of this claim, defendant argues the judge "misapplied fact and law with respect to two dissipation events" allegedly committed by plaintiff. According to defendant, she should have been awarded half of the $285,200 paid to plaintiff's parents and part of the $74,000 plaintiff allegedly received from the Winterbottom investment. We disagree.

As envisioned by the Legislature, when a court equitably distributes marital property, it must consider "[t]he contribution of each party to the acquisition, dissipation, preservation, depreciation or appreciation in the amount or value of the marital property, or the property acquired during the civil union as well as the contribution of a party as a homemaker[.]" N.J.S.A. 2A:34-23.1i (emphasis added). This court has consistently upheld and enforced this basic equitable principle. As Judge Pressler noted in Vander Weert v. Vander Weert, "the distributable marital estate is deemed to include assets diverted by one of the spouses in contemplation of divorce and for the purpose of diminishing the other spouse's distributable share." 304 N.J. Super. 339, 349 (App. Div. 1997); see also Monte v. Monte, 212 N.J. Super. 557, 567-68 (App. Div. 1986) (debts resulting from spouse's dissipation of marital assets will not be charged to other spouse).

The concept of dissipation "is a plastic one, suited to fit the demands of the individual case." Kothari v. Kothari, 255 N.J. Super. 500, 506 (App. Div. 1992). In determining whether a spouse has dissipated marital assets, courts consider the following factors:

> (1) the proximity of the expenditure to the parties' separation, (2) whether the expenditure was typical of expenditures made by the parties prior to the breakdown of the marriage, (3) whether the expenditure

27                                                                                    A-2822-16T4

benefitted the "joint" marital enterprise or was for the benefit of one spouse to the exclusion of the other, and (4) the need for, and amount of, the expenditure.

[Id. at 507 (quoting Lee R. Russ, Annotation, Spouse's Dissipation Of Marital Assets Prior to the Divorce as a Factor In Divorce Court's Determination of Property Division, 41 A.L.R. 4th 416, 421 (1985)).]

"The question ultimately to be answered by a weighing of these considerations is whether the assets were expended by one spouse with the intent of diminishing the other spouse's share of the marital estate." Ibid.

Under equitable distribution, the statutory factors enumerated in N.J.S.A. 2A:34-23.1, "used in concert with the facts of each case," inform the otherwise "broad discretion" accorded to the trial judge. Steneken v. Steneken, 367 N.J. Super. 427, 434-35 (App. Div. 2004), aff'd as modified, 183 N.J. 290 (2005). As a result, "[w]here the issue on appeal concerns which assets are available for distribution or the valuation of those assets, it is apparent that the standard of review is whether the trial judge's findings are supported by adequate credible evidence in the record." Borodinsky v. Borodinsky, 162 N.J. Super. 437, 443-44 (App. Div. 1978). And, relatedly, when the issue involves the manner in which the trial court allocated the marital assets, the trial court's determination is subject to an abuse of discretion standard. Id. at 444.

28

Against this backdrop, we address the loan plaintiff's parents made to their son to enable him to attend Columbia University. Defendant claims that under the Kothari factors, she is entitled to one-half of the value of the loan repayments made to plaintiff's parents as a dissipation event. Defendant emphasizes that plaintiff made most of the alleged loan payments proximate to the divorce in 2012-2013. She argues that this expenditure was not typical of the marriage nor consistent with plaintiff's debt-averse philosophy. This was not included in the family's spreadsheets, and there was no reliable evidence of the amount of the loan. According to defendant, this "loan" was more akin to a gift than a legitimate marital debt because: (1) plaintiff's calculation of the interest rate was arbitrary and (2) his parents made the loan before the marriage. Under these circumstances, defendant argues she "should not have to contribute to these usurious terms with her share of marital assets."

Again we disagree. Although the trial judge did not specifically comment on the Kothari factors, the following factual findings support the judge's decision to recognize this as a legitimate loan:

> [T]here was a valid loan from [p]laintiff's parents to [p]laintiff, which funded his higher education. There was a written agreement by [p]laintiff's parents with interest included that the funds were a loan. Furthermore . . . [p]laintiff began paying the loan back

in 2009 on a regular basis and continues to pay the balance until paid in full.

The evidence does not support defendant's assertion that this was a dissipation event. The documentation in this record supports the judge's finding that this was in fact a legitimate loan owed to plaintiff's parents. These evidential documents included a repayment agreement, bank correspondence, and wire instructions. These documents were signed by the parties and their authenticity was not disputed.

A weighing of the Kothari factors also supports the judge's decision to reject defendant's dissipation argument. The loan payments did not start at the time of the separation; they began at least four years before plaintiff filed the divorce complaint. Plaintiff began to repay the loan when he reached an appropriate level of financial security. Although this is not a typical marital expense, student loan payments are necessarily unique because they correspond to an expense which is usually undertaken only once or twice in an individual's lifetime. We acknowledge that the absence of a precise repayment schedule is not a typical feature of a standard loan. Mindful of the parent-child relationship underpinning the loan, the absence of certain formalities is to be expected. However, as the judge found, the record shows that the principal amounts and interest rates were sufficiently clear to reflect the parties' intentions. Plaintiff's

30

own repayment schedule showed the precise payments made and detailed accruing interest.

Defendant's argument that she should not be held responsible to pay usurious rates of interest involving a premarital loan is equally unavailing. Her reliance on this court's decision in Monte is not dispositive. Although Monte supports the notion that loans incurred prior to a marriage are typically the obligation of the original borrower, we limited this holding to marital debts, "which are directly traceable to the acquisition of marital property." 212 N.J. Super. at 567. Here, the loan facilitated the success of plaintiff's prosperous career in finance, which benefitted the entire family. This is the type of loan that may be deemed a marital debt. It is self-evident that the opportunities afforded by a degree funded by this debt led to the lifestyle which the entire family enjoyed. Defendant and the children will continue to derive a benefit from plaintiff's education through the durational alimony and child support payments.

We next address whether defendant is entitled to one-half of the proceeds of the Winterbottom investment. Defendant claims plaintiff made this investment without her knowledge. Relying on Winterbottom's testimony that he arranged for plaintiff to recover $74,000 of the original $100,000 investment,

31

defendant rejects any assertion that the investment was a total loss. The trial judge rejected defendant's claim as a matter of credibility.

The trial judge considered defendant's testimony "that she had no knowledge of the sum of $100,000 being invested with Mr. Winterbottom [as] disingenuous." The judge found the parties "discussed their finances every Sunday and if such a large amount was missing, defendant certainly would have known it[.]" The judge characterized defendant's relationship with Mrs. Winterbottom as "very close friends." The judge held that defendant is "entitled to a credit of 50%" of what plaintiff may recover in the future from this investment.

The record does not support classifying the investment with Winterbottom as a dissipation event. Plaintiff made the investment with defendant's close friend while the parties were married. Although Winterbottom expressed his belief that plaintiff was due to receive $74,000, he acknowledged that he never received confirmation that plaintiff actually received this payment; the family's tax return did not show a loss related to this investment. The judge also considered Winterbottom's testimony suspect in light of his and Mrs. Winterbottom's close relationship with defendant and his estrangement from plaintiff throughout this acrimonious divorce. The judge applied the relevant

Kothari factors and found that although this expenditure was made shortly before the parties' separation, it was nevertheless a typical one for a couple who often made significant financial investments in monetary funds.

The judge properly weighed the contradictory evidence to conclude that defendant was not entitled to any immediate credit based on this investment because there was insufficient proof of its value and status. However, the judge also reasonably ruled that defendant was "entitled" to a 50% credit of whatever plaintiff recovers, "if anything, in the future from the loss." We conclude the judge reasonably found that there were no proceeds to which defendant was immediately entitled. In the event plaintiff is able to recover anything from this investment, defendant will be fairly compensated.

Defendant also argues that the judge erred in quashing a subpoena she served upon Gray Insurance Company during the trial to obtain a copy of any check payable in connection with this investment. It is a well-settled principle of appellate jurisprudence that absent a clear abuse of discretion or an obvious misunderstanding or misapplication of the law, appellate courts should defer to a trial judge's discovery rulings. Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 371 (2011). We discern no legal basis to disregard this admonition here.

Defendant challenges the judge's award of durational alimony as insufficient. Specifically, she alleges that the court made inconsistent and deficient findings regarding the marital lifestyle, improperly relied on the family's budget spreadsheets, and miscalculated the marital savings component. She also claims the trial judge ignored her "contributions to the marriage and ongoing obligations to the children" and improperly imputed income to her. Defendant argues the trial judge erroneously discounted plaintiff's ability to pay alimony and based the alimony decision on "faulty assumptions."

Defendant sought limited duration alimony in the amount of $350,000 per year, for thirteen years. The trial judge awarded defendant limited duration alimony in the amount of $200,000 per year, for seven years. The judge noted that accepting the accuracy of defendant's monthly budget as approximately $33,784, an alimony award of $350,000 per year would leave defendant with a $55,408 annual deficit, or $4,617.33 per month shortfall. The judge found defendant's actual budget to be approximately $10,333 per month, although that amount did not include any savings component. With respect to the savings component, the court found:

> The parties deposited a total of $5000 every per month
> [sic] in their joint savings account on a regular basis.

Defendant alleges that the amount they saved regularly every month was approximately $39,000 per month. This [c]ourt finds . . . [p]laintiff's testimony that the parties saved $5000 per month on a regular basis for future expenses was reasonable to be considered a regular plan of savings throughout the marriage. Furthermore, [d]efendant would like this court to believe that they saved half of the gross amount of [p]laintiff's salary each and every year is not possible [sic]. According to [d]efendant, the parties saved approximately $468,000 per year. Had the parties saved almost half a million dollars each year, their net worth would have been significantly more than it actually is.

    . . . .

What is evident is that the parties were able to amass significant savings over the parties thirteen (13) year marriage, based upon the information provided to the court, it is reasonable to conclude that the parties saved approximately $120,000 per year for savings ($5000 per month on a regular basis and an additional $60,000 per year for the balance left in the budget after monthly bills were paid) and [d]efendant should be entitled to continue to have a savings component included in the alimony award. Accordingly, this [c]ourt concludes that $5000 per month, which is one-half of the yearly savings . . . . [d]efendant's monthly budget, including savings is therefore $15,333 per month.

Regarding defendant's imputed income:

This court imputes $63,000 per year to the [d]efendant which the court finds is more than reasonable given the fact that the [d]efendant is an accountant and has earned in excess of $100,000 previously. She earned $63,000 per year as a [r]ealtor prior to 2007 when she stopped

35

working. If [d]efendant choses [sic] to return to work, she certainly could earn even more than she did previously as an [a]ccountant; however, for the purpose of establishing alimony, this [c]ourt finds that $63,000 is fair given the fact that she has not been employed over the last 8 or so years and will have to re-enter the job market at a lower salary.

Given a tax rate of 33%, ($20,790) for the Federal Income Tax and 6.37% ($4,013.10) for the New Jersey tax rate, the [d]efendant will net from a salary of $63,000 per year approximately $38,196.90 per year or $3,183.07 per month.

The judge acknowledged that defendant "should be entitled to continue to have a savings component" because she was accustomed to saving during the marriage. However, the judge concluded that defendant's "demand for alimony in the amount of $350,000 per year and $60,000 per year for child support was completely inconsistent with the parties' lifestyle." Based on the evidence presented by the parties, the judge determined that defendant's "monthly budget, including savings" is $15,333 per month, of which $5000 was intended for savings and the balance for expenses.

"Awarding . . . [d]efendant $200,000 gross per year in alimony each year will provide a net of $10,105 per month given the tax rate of 33% ($66,000) for federal taxes and 6.37% for New Jersey State Taxes ($12,740)." Based on this record, the judge found:

> [H]aving considered all of the factors pursuant to [N.J.S.A. 2A:34-23b], and having weighed heavily on the factors relating to the current earnings of the parties, the [d]efendant's actual need and the [p]laintiff's ability to pay support, the credibility of the parties, equitable distribution, and the duration of the marriage, finds that [p]laintiff shall pay Limited Durational Alimony for a term of seven (7) years at a rate of $200,000.00 per year.

The judge held that the seven-year duration of the alimony obligation "provides [d]efendant ample time to stabilize economically and re-enter her career in [a]ccounting or [r]eal [e]state upon the termination of the parties' marriage." In reaching this decision, the judge

> relied heavily on the fact that the [d]efendant had been receiving pendente lite support for the past 3 years, from October 4, 2013 which was the filing of the Complaint for Divorce to the date the court decided this matter bringing the [p]laintiff's obligation to a period of ten (10) years after the date of the filing of the Complaint.

In determining the alimony award, the court specifically considered and made detailed findings as to each of the fourteen factors under N.J.S.A. 2A:34-23b(1)-(14). We are bound to defer to the judge's findings regarding alimony if these findings are supported by the record. Reid v. Reid, 310 N.J. Super. 12, 22 (App. Div. 1998). Alimony can be modified when the economic circumstances of the parties change. N.J.S.A. 2A:34-23c. However, "the goal of a proper

37

alimony award is to assist the supported spouse in achieving a lifestyle that is reasonably comparable to the one enjoyed while living with the supporting spouse during the marriage." Crews v. Crews, 164 N.J. 11, 16 (2000). It is "critical" and "essential" to "[i]dentify[] the marital standard of living at the time of the original divorce decree . . . regardless of whether the original support award was entered as part of a consensual agreement or of a contested divorce judgment." Id. at 25.

In determining an award of alimony, the judge must consider the thirteen factors enumerated in N.J.S.A. 2A:34-23b, as well as any other factors deemed relevant. Heinl v. Heinl, 287 N.J. Super. 337, 344 (App. Div. 1996). Within this statutory framework, the judge retains "broad discretion in setting an alimony award and in allocating assets subject to equitable distribution." Clark v. Clark, 429 N.J. Super. 61, 71 (App. Div. 2012). Our review of the judge's decision is guided by a recognition of the family courts' special jurisdiction and expertise in family matters. Cesare v. Cesare, 154 N.J. 394, 413 (1998).

We will not disturb an alimony award on appeal if the trial judge's conclusions are consistent with the law and not "manifestly unreasonable, arbitrary, or clearly contrary to reason or to other evidence, or the result of whim or caprice." Foust v. Glaser, 340 N.J. Super. 312, 316 (App. Div. 2001) (quoting

Raynor v. Raynor, 319 N.J. Super. 591, 605 (App. Div. 1999)). Our role is to determine whether the trial judge's factual findings are supported by "adequate, substantial, credible evidence" in the record and the judge's conclusions are in accordance with the governing principles. Ibid. (quoting Cesare, 154 N.J. at 411-12). We will reverse a judge's award of alimony only if the record shows "the trial court clearly abused its discretion, failed to consider all of the controlling legal principles, or must otherwise be well satisfied that the findings were mistaken or that the determination could not reasonably have been reached on sufficient credible evidence present in the record after considering the proofs as a whole." Heinl, 287 N.J. Super. at 345.

Here, the judge systematically and carefully addressed all of the appropriate factors under N.J.S.A. 2A:34-23b. After considering the information in the CIS, the parties' testimony regarding the marital lifestyle and financial matters, and the documentary evidence, the judge characterized the parties' lifestyle as "modest upper class." We are satisfied the judge's finding of the parties' marital lifestyle is supported by the record and constitutes a correct application of the relevant legal principles.

IV

Defendant challenges the trial court's decision to impute $63,000 annual income to her. Defendant argues the judge erred when she found defendant did

not defer her career goals and "required no further training" to earn the imputed amount. We reject this argument substantially for the reasons expressed by the trial judge in her thorough written decision.

Defendant is an accountant who has earned in excess of $100,000 when employed fulltime in this capacity. She has also earned $63,000.00 per year as a realtor prior to 2007, when she voluntarily stopped working. Under these circumstances, the judge found an imputed annual income of $63,000 was "fair given the fact that she has not been employed over the last [eight] or so years and will have to re-enter the job market at a lower salary."

A trial judge has the discretionary authority to impute income to a party in a marital dissolution case based upon the evidence presented. Sternesky v. Salcie-Sternesky, 396 N.J. Super. 290, 307-08 (App. Div. 2007). The judge may impute income to a parent who is voluntarily unemployed. Caplan v. Caplan, 182 N.J. 250, 268-69 (2005); Strahan v. Strahan, 402 N.J. Super. 298, 312 (App. Div. 2008). A party cannot intentionally diminish his or her earning capacity and expect to be relieved of the obligation to support one's family. Arribi v. Arribi, 186 N.J. Super. 116, 118 (Ch. Div. 1982). Unearned or passive income, such as income generated from assets, may also be used to determine the

appropriate support obligation. Stiffler v. Stiffler, 304 N.J. Super. 96, 101 (Ch. Div. 1997).

Imputation of income is not the product of an exact process. The judge's ultimate decision is a discretionary matter not capable of precise determination. The judge arrives at an amount of imputed income based on the evidence presented at trial of the party's employment history, educational background, and marketable skills. Storey v. Storey, 373 N.J. Super. 464, 474 (App. Div. 2004). There are no bright line rules that govern the imputation of income. Ibid. A trial judge's imputation of a specific amount of income "will not be overturned unless the underlying findings are inconsistent with or unsupported by competent evidence." Id. at 474-75. We can only reverse if the record shows the judge abused her discretion in imputing $63,000 annual income to defendant. Tash v. Tash, 353 N.J. Super. 92 (App. Div. 2002).

In this light, we discern no factual or legal basis to conclude the judge abused her discretionary authority by imputing $63,000 annual income to defendant.

We reject defendant's remaining arguments challenging the judge's decision on child support, additional payments due from plaintiff, pendente lite relief, and denial of an award of counsel fees substantially for the reasons

expressed by Judge Marcella Matos Wilson in her well-reasoned written opinion. We also reject plaintiff's cross-appeal in which he argues that Judge Matos Wilson erred by awarding a defendant retroactive savings component pendente lite and by failing to give him a credit for defendant's pendente lite spending in excess of their marital standard. The record shows Judge Matos Wilson managed a protracted, exceptionally contentious matrimonial trial with great professionalism and equanimity. She addressed all of the issues raised by the parties and reached an unassailable legal determination on all of them.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2822-16T4